UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 20-11168-JGR |
| SUMMERBROOK DENTAL GROUP, PLLC | ) | |
| EIN: 61-1522031 | ) | Chapter 11, Subchapter V |
| | ) | |
| Debtor. | ) | |

## SECOND AMENDED PLAN OF REORGANIZATION DATED SEPTEMBER 18, 2020 FOR SMALL BUSINESS UNDER CHAPTER 11, SUBCHAPTER V

Summerbrook Dental Group, PLLC ("Summerbrook" or "Debtor"), Debtor and Debtor-in-Possession in this Chapter 11 case, sets forth its Second Amended Plan of Reorganization Dated September 18, 2020 as follows:

## I.      INTRODUCTION

1.1 -    This document constitutes the Plan of Reorganization for the Debtor.   This document is designed to provide all creditors and parties in interest with sufficient information with which to make an informed vote as to the acceptance or rejection of the Debtor's Plan.

1.2 -    Any terms which are set forth in this document and defined in the Bankruptcy Code shall have the meaning attributed to them as set forth on Appendix 1 attached hereto.

1.3 -    Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" under the Plan are entitled to vote to accept or reject the Plan.  Classes of Claims and Interests that are not impaired are not entitled to vote and are deemed to have accepted the Plan. Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules, and a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting. Each holder of an Allowed Claim in Classes 2 through 7 shall be entitled to vote to accept or reject the Plan.

1.4 -    Regardless of creditor votes, if the Plan meets all of the applicable requirements of Section 1129(a) of the Bankruptcy Code, other than subsections (8), (10), and (15), the Court may confirm the Plan if it does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

1

1.5 -   As discussed more fully below, the Debtor firmly believes that the Plan represents the best alternative for providing the maximum value for creditors.  The Plan provides creditors with a distribution on their Claims in an amount greater than any other potential known option available to the Debtor.

1.6 -   THIS PLAN AND THE DISCLOSURES CONTAINED HEREIN HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION.  THE COMMISSION HAS SIMILARLY NOT REVIEWED THE ACCURACY OR ADEQUACY OF THIS PLAN.

## II.    HISTORY AND EVENTS LEADING TO BANKRUPTCY

The Debtor is a Colorado professional limited liability company that owns and operates a dental practice in Aurora, Colorado.  Summerbrook is owned and operated by Dr. James Craig, a dentist licensed in the State of Colorado, who formed Summerbrook in 2007.

The Debtor operated successfully for a number of years, progressively growing its patient base and was profitable until 2017. In 2017, the Debtor retained a contract dentist to attract additional clientele in order to build revenue, and hired the Brady Group and Dr. Chris Brady to provide consulting services.  Dr. Brady suggested that the Debtor restructure its business model at that time, moving to a business model that resulted in increased expenses but was unable to generate the additional revenue necessary to cover the increased expenses.  Additionally, the new dentist hired by the Debtor proved to be highly ineffective, further resulting in increased expenses without a corresponding growth in revenue.  As a result of the increased expenses, the Debtor began to struggle financially.

The Debtor terminated the dentist and the consultant in early 2018, and worked diligently to address the financial issues through 2018. At the end of 2018, it became apparent that a second dentist would be necessary to generate the revenue necessary to maintaining the Debtor's operations.  The Debtor hired a new dentist in early 2019 and while the practice revenue did increase, the increase in revenue was insufficient to offset the prior expenses incurred as a result of the failing dentist or the loss of revenue that was realized as a result of the poor consulting advice.

In order to meet increasing expenses, the Debtor entered into several Merchant Cash Advance Agreements  with a number of lenders, including LG Funding, LLC, National Funding, Funding Circle, OnDeck Capital, and Headway Capital to provide the Debtor with necessary

operating capital. While the funds provided by these Merchant Cash Advance Agreements allowed the Debtor to meet its immediate cash needs, each of the loans had substantial interest rates and required substantial payments from the Debtor.

In late 2019, Debtor was ultimately able to repay several of its factoring companies with a crypto currency called XTroptions.gold. One of the companies, LG Funding, refused to accept the repayment in cryptocurrency, and instead initiating a lawsuit in New York and causing a hold to be placed on the Debtor's accounts. The hold on the Debtor's accounts cause further financial difficulties for the Debtor. As a result of the continued financial difficulties, the Debtor filed its voluntary petition for relief under Chapter 11, Subchapter V on February 21, 2020 in order to restructure its operations and continue as a going concern.

**Additional information regarding the Debtor's pre-petition transfers and activity is included in the Report of Investigations prepared by the Subchapter V Trustee, attached hereto as Exhibit E.**

## III.   PLAN OVERVIEW AND CLASSIFICATION OF CLAIMS AND INTERESTS

| CLASS | STATUS | TREATMENT |
|---|---|---|
| Administrative Expense Claim of Wells Fargo Bank, N.A., and/or the Small Business Administration | | The Small Business Administration ("SBA") holds an administrative expense claim in the amount $193,803 for a loan extended under the Payroll Protection Program ("PPP Loan"). The Debtor will apply for forgiveness when the forgiveness application becomes available. To the extent not forgiven, the PPP Loan will be amortized with interest at the contractual rate of 1%, and paid in equal monthly installments of $4,120.53 over four years. |
| Class 1 - Allowed Claims Pursuant to 11 U.S.C. § 507(a)(4) and (a)(5) – Wage Claims | Unimpaired | Paid in full over one year without interest following the Effective Date of the Plan.<br><br>The Debtor does not believe that any Class 1 claims exist. |
| Class 2 – Independent Bank | Impaired | Allowed in the amount of $530,000 and shall bear interest at a rate of 4.25% per annum. Class 2 Claim shall retain all liens and will be paid in equal monthly installments based on a |

3

| | | |
|---|---|---|
| | | 15-year amortization. Notwithstanding the 15-year amortization, the remaining balance of the loan will become due and payable on the five-year anniversary of the Effective Date of the Plan.<br><br>The Debtors shall make interest only payments for the first twelve (12) months following the Effective Date of the Plan, following which the monthly payment on account of the Class 2 Claim shall be $3,987.08 per month. The balloon payment due on the five-year anniversary of the Effective Date of the Plan in the amount of shall be $422,305.55, which amount shall be paid through refinance or available capital. |
| Class 3 - Byline Financial | Impaired | The Class 3 Claim will be allowed in the amount of $30,000, and shall bear interest at a rate of 4% per annum. The Class 3 Claim shall be amortized and paid in equal monthly installments over a 5-year period following the Effective Date of the Plan.<br><br>The monthly payment on account of the Class 3 Claim will be approximately $552.50 |
| Class 4 – U.S. Bank N.A. d/b/a U.S. Bank Equipment Finance | Impaired | The Class 4 Claim will be allowed in the amount of $75,000 and shall bear interest at a rate of 4% per annum. The Class 4 Claim shall be amortized and paid in equal monthly installments over a 6-year period following the Effective Date of the Plan.<br><br>The monthly payment on account of the Class 4 Claim will be approximately $1,173.39. |
| Class 5 – FC Marketplace | Impaired | The Class 5 Claim will be allowed in the amount of $100,000 and shall bear interest at a rate of 4% per annum. The Class 5 Claim shall be amortized and paid in equal monthly installments over a 6-year period following the Effective Date of the Plan.<br><br>The monthly payment on account of the Class 5 Claim will be approximately $1,564.52. |
| Class 6 – On Deck | Impaired | The Class 6 Claim will be deemed unsecured pursuant to 11 U.S.C. § 506 and treated as a Class 7 General Unsecured Claim. |

| Class 7 - General Unsecured Claims | Impaired | Payment of a varying percentage of Gross Revenue over a three year period following the earlier of the date on which administrative claims are paid in full or six months after the Effective Date of the Plan. Distributions to Class 7 Claims shall be made every 6 months.<br><br>Class 7 Creditors are anticipated to receive approximately 11.0% of their Allowed Claims under the Plan. |
|---|---|---|
| Class 8 - Claims Held by the Bankruptcy Estate of James Craig | Unimpaired | On the Effective Date of the Plan, the Debtor shall return all cryptocurrency transferred to the Debtor by Dr. James Craig. |
| Class 9 - Interests in Summerbrook | Unimpaired | Retained by the pre-petition interest holders on the Effective Date of the Plan. |

## IV.    DESCRIPTION OF ASSETS

The values of the Debtor's assets, owned on the Petition Date unless otherwise noted, are set forth in the following chart:

| Asset | Estimated Value |
|---|---|
| Funds in Accounts (as of 11/30/20) | $54,228.37 |
| Rent Deposit | $6,000 |
| Accounts Receivable (as of 11/30/20) | $65,397.23 |
| Dental Supply Inventory | $4,000 |
| Disposable Inventory | $4,000 |
| Office Furniture | $6,000 |
| X-Guide | $30,000 |
| Office Equipment, Software, and Computers | $400,000 |
| C/T Pano Machine | $75,000 |
| Website | Unknown |
| Customer Pre-Payments | Unknown |
| Troptions.gold Cryptocurrency | Unknown |
| Xtroptions.gold Cryptocurrency | Unknown |
| Shareholder Loan | $0 |
| Total | $644,625.60 |

The asset values set forth above are as of the Petition Date unless otherwise noted. The value of the tangible assets is based on the liquidation value unless otherwise noted. The Debtor's physical assets, comprised of its office furniture, equipment, and computers are several years old, and would have minimal value in a liquidation. Additionally, the Debtor's dental supplies would similarly have minimal value in the event of a liquidation.

The Debtor also holds 130.00000000 units of Troptions.gold cryptocurrency and 129,534.80042143 units of XTroptions.gold cryptocurrency. A majority of the Debtor's cryptocurrency was acquired through repayment of a shareholder loan from Dr. James Craig in December 2019. The remainder was acquired as payment for services provided by the Debtor. Unlike more common forms of cryptocurrency, such as Bitcoin, the Troptions.gold and XTroptions.gold cryptocurrency are not directly convertible to dollars. Rather, the cryptocurrency would have to be exchanged for more readily marketable cryptocurrency on trading platforms if the party wishing to sell the cryptocurrency can find a party willing to make the trade. The Debtor is unaware of any readily available avenue to convert the cryptocurrency to dollars.

The only available source of information the Debtor has on the value of the cryptocurrency is the Troptions website. As of the date of filing this Plan, troptionsexchange.com lists the price of Troptions.gold at $433.46 per unit, and XTroptions.gold at $6.05 per unit. Assuming that the values provided are correct, the value of the Debtor's units of Troptions.gold is $52,015.20, and the value of the Debtor's units of XTroptions.gold units is $783,685.54. While Summerbrook has not obtained an independent opinion on the value of the cryptocurrency, Dr. Craig recently obtained an independent valuation of the similar units of cryptocurrency that he holds, and the report confirmed that there is no market available to resell or exchange the cryptocurrency, and therefore the cryptocurrency has no value. A copy of the report is attached hereto as Exhibit D.

The Debtor has also listed the shareholder loan that appears on the Debtor's balance sheet. The shareholder loan is not evidenced by a promissory note or any loan agreement, and was created as a tax planning mechanism by the Debtor and Dr. Craig's accountant. Dr. Craig has filed for bankruptcy individually, and has proposed a Plan of Reorganization that, if confirmed, will provide payments to unsecured creditors, most of whom are also creditors in the Debtor's case. If the Debtor were to attempt to collect on the shareholder loan by filing a proof of claim, it would be diluting payments to unsecured creditors in Dr. Craig's personal case, just to pay the amounts received to the same creditors in its case. Accordingly, the Debtor does not intend to pursue

6

collection of the alleged shareholder loan, particularly given that there is no promissory note or lending agreement evidencing the alleged loan.

The Debtor's other assets are comprised of intangible assets, including its website and customer list.  The Debtor's intangible assets only have value if the Debtor remains a going concern.

**Avoidance Actions**

Certain Avoidance Actions pursuant to 11 U.S. C. §§ 545 through 550 and related actions exist in this case.  The Debtor listed a number of payments to creditors in an amount greater than $6,825.00, the preference threshold amount, within the 90 days prior to the Petition Date, including payments to creditors made by transferring cryptocurrency to creditors from the Debtor by way of transmission of a digital wallet.  Some of the transfers were payments for dental supplies from vendors, and are not subject to recovery.  The Debtor is still in the process of evaluating whether other payments made within the 90 days prior to filing constitute valid and avoidable preference actions under 11 U.S.C. § 547.

The Debtor has identified a clear preference claim against Independent Bank.  The Debtor entered into a Business Loan Agreement, Promissory Note, and Security Agreement (the "Loan Documents") with Independent Bank on or about July 31, 2019.  Pursuant to the Loan Documents, the Debtor granted Independent Bank a security interest in substantially all of its assets, including but not limited to equipment, furniture, supplies, accounts, cash, and cash equivalents.  Despite extending the loan to the Debtor on or around July 31, 2019, Independent Bank failed to file a UCC-1 Financing Statement until January 22, 2020, almost 6 months after entering into the loan with the Debtor, and less than ninety days prior to filing.  While the Debtor believes that the preference action is clear cut, the amount of Independent Bank's secured claim that would be subject to avoidance would require a detailed analysis of the value of the Debtor's assets at the time of extending the loan and as of the filing date to determine if the Debtor was insolvent as of the date of recording the financing statement, as solvency is an absolute defense to a preference action.  Additionally, Independent Bank has a lien on the Debtor's equity interests that are owned by Dr. Craig, and that were properly perfected on a pre-petition basis, and that would not be avoidable as a preference.  The Debtor believes that this process can be handled more efficiently and effectively through the Plan in lieu of filing an Adversary Proceeding, but reserves the right to commence an Adversary Proceeding to pursue its preference claim against Independent Bank.

The Debtor has also identified a number of payments to Dr. Craig and BFB, Inc., a company owned by Dr. Craig's wife. Dr. Craig is the primary dentist performing services for the Debtor, and is the sole holder of equity in the Debtor. BFB similarly provided practice management and billing services to the Debtor. As such, the Debtor does not believe that amounts paid Dr. Craig and BFB are avoidable transfers. Additionally, as set forth above, Dr. Craig filed for bankruptcy individually, and any claim to avoid transfers to Dr. Craig would be an unsecured claim, and would dilute payments to unsecured creditors under Dr. Craig's plan, just to pay the amounts received to the same creditors in the Debtor's case. As such, the Debtor does not intend to pursue any Avoidance Actions against Dr. Craig or BFB at this time. **Additional information regarding the Debtor's pre-petition transfers and activity is included in the Report of Investigations prepared by the Subchapter V Trustee, attached hereto as Exhibit E.**

Debtor's investigation of other potential preference and fraudulent conveyance claims is ongoing, and the Debtor will continue to use its best efforts to evaluate possible claims. Pursuant to 11 U.S.C. § 546(a)(1), Avoidance Actions must be commenced on or before February 21, 2022. Any Avoidance Actions not commenced by that time shall be deemed abandoned.

## V.    CLAIMS AND INTERESTS

### A. UNCLASSIFIED PRIORITY CLAIMS

Claims which are more particularly defined under Section 507(a)(1), 507(a)(2) or 507(a)(8) of the Bankruptcy Code are not classified and will be paid in full on the Effective Date of the Plan. These claims consist of administrative expenses incurred during the course of the Chapter 11 case, claims incurred in an involuntary case (which are not applicable) and certain priority tax claims.

### B. ADMINISTRATIVE EXPENSE CLAIMS

The Debtor retained Kutner Brinen, P.C. as its bankruptcy counsel. The Debtor provided KB with a retainer in the amount of $11,053.00. The Debtor estimates that the total legal fees for KB through Plan confirmation will be $38,000, which will be reduced by the retainer. The total amount owed to KB after application of the retainer is anticipated to be approximately $27,000 depending on litigation over the Plan. The Subchapter V Trustee, Joli Lofstedt, also has an administrative expense for claims

8

incurred during the course of the Debtor's bankruptcy case. Ms. Lofstedt's fees are not expected to exceed $10,000.

The administrative expense claims for professionals shall be through the Plan over a period not to exceed one year following the date of confirmation of the Plan ("Effective Date"). The Debtor can prepay the professional fee claims at any time. Assuming the total professional fees to be paid through the Plan are $37,000 the monthly payment shall be approximately $3,083.

Post-petition, the Debtor also obtained a loan through the Paycheck Protection Program ("PPP"). On or about May 5, 2020, the Debtor entered into a Paycheck Protection Program Promissory Note and Agreement with Wells Fargo Bank, NA. for a PPP loan in the amount of $197,803  In accordance with the terms of the PPP loan, the PPP loan is fully forgivable so long as the funds were used for approved costs, including but not limited to payroll costs, rent payments, utility payments, or costs for providing employee benefits. The Debtor used all of the PPP loan funds for approved purposes, and therefore anticipates that the loan will be fully forgiven. To the extent not forgiven, any remaining amounts owed will be paid in accordance with the loan documents. As of the date of filing this Plan, the Debtor has not yet applied for forgiveness of the PPP loan as Wells Fargo is not yet accepting applications for PPP loan forgiveness. The Debtor intends to apply for full forgiveness as soon as it is able to do so.

## C. TAX CLAIMS

The Internal Revenue Service ("IRS") filed Proof of Claim No. 7-3 on September 2, 2020, asserting a priority claim in the amount of $165.57 based on an estimate for unpaid corporate income taxes and unemployment taxes. At the time of filing the Debtor's bankruptcy case, the returns were not yet due. The IRS's priority claim will be paid in full on the Effective Date of the Plan. Failure to timely file tax returns following the Effective Date of the Plan shall constitute an event of default, and shall be treated as set forth in paragraph 11.7 below.

## D. ADMINISTRATIVE EXPENSE CLAIM FOR PPP LOAN

Wells Fargo Bank, N.A. and/or the Small Business Administration ("SBA") holds an administrative expense claim in the amount of $193,803 for a loan extended under the Payroll Protection Program (the "PPP Loan"). The Debtor intends to apply for

forgiveness of the PPP Loan once application open through the loan servicer, Wells Fargo Bank, N.A. ("Wells Fargo"). If the Debtor's forgiveness application is denied, the administrative expense claim of the SBA will be amortized with the contractual interest rate of 1% and paid in equal monthly installments over a four (4) year period beginning the first full month after the forgiveness application is denied. The monthly payment on account of the PPP Loan will be approximately $4,120.53.

## VI.    CLASSIFIED CLAIMS

6.1 - **CLASS 1.    Priority Wage Claims.** Allowed Class 1 Priority Claims shall be paid in full on the Effective Date, unless the holder of a Class 1 claim agrees to an alternative treatment. The Class 1 claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4) and 507(a)(5) of the Code.

Post-petition, on February 21, 2020, the Debtor filed a *Motion of Debtor and Debtor in Possession for an Order Authorizing (A) Payment of Prepetition Employee Wages and Salaries and (B) Payment of All Costs and Expenses Incident to the Foregoing Payments* (Docket No. 9) ("Wage Motion"). The Court entered an Order granting the Wage Motion on February 25, 2020 (Docket No. 31). As a result, the Debtor does not believe that any Class 1 Claims exist.

6.2 - **CLASS 2.  Independent Bank.** The Class 2 Secured Claim consist of the Allowed Secured Claim of Independent Bank. The Class 2 Secured Claim is secured by a lien on substantially all of the Debtor's assets. The Class 2 Secured Claim is impaired by this Plan. The Class 2 Secured Claim will be treated and paid as follows:

      a.    The principal amount of the Class 2 Claim will be allowed in the amount of $530,000. The remainder of Class 2 Claim will be deemed unsecured pursuant to 11 U.S.C. § 506 and treated as a Class 7 general unsecured claim;

      b.    The Class 2 Claim will bear interest at the rate of: (i) 4.25% per annum commencing on the Effective Date of the Plan; or (ii) if the Class 2 claimant objects to such rate in writing and serves a copy of such objection on the Debtor at least fifteen (15) days prior to the commencement of the confirmation hearing, such rate will be determined by the Court as necessary to satisfy the requirements of 11 U.S.C. §1129(b) of the Code; or (iii) such other rate as agreed by the Debtor and the Class 2 claimant;

     c.    The Class 2 claimant will retain all liens that secured its Claim as of the Petition Date;

     d.    in the Class 2 Claim shall be paid in interest only payments for the first twelve (12) months following the Effective Date of the Plan, following which the payment shall increase to equal monthly installments based on a fifteen-year (15) amortization beginning the first full month following the Effective Date.  Notwithstanding the fifteen-year amortization, the remaining balance of the loan will become due and payable on the five-year anniversary of the Effective Date of the Plan;

     e.    The Debtor shall be entitled to prepay the Class 2 Claim without premium or penalty; and

     f.    Based upon the interest rate and amortization period, the interest only payments due on account of the Class 2 Claim for the first twelve (12) months shall be $1,877.08, following which the payment due on account of the Class 2 Claim shall increase to $3,987.08. The balloon payment due on the five-year anniversary of the Effective Date of the Plan shall be $422,305.55.

6.3 -   **CLASS 3.  BFG Corporation d/b/a Byline Financial Group.**   The Class 3 Secured Claim consist of the Allowed Secured Claim of BFG Corporation dba Byline Financial Group ("Byline").  On or about December 9, 2019, the Debtor entered into an Installment Payment Agreement with Byline for the purchase of an X-Guide, Computer Guided Dental Implant machine, pursuant to which the Debtor granted Byline a lien in the X-guide.  The Class 3 Secured Claim is impaired by this Plan.  The Class 3 Secured Claim will be treated and paid as follows:

     a.    The principal amount of the Class 3 Claim will be allowed in the amount of $30,000.  The remainder of Class 3 Claim will be deemed unsecured pursuant to 11 U.S.C. § 506 and treated as a Class 7 general unsecured claim;

     b.    The Class 3 Claim will bear interest at the rate of: (i) 4.0% per annum commencing on the Effective Date of the Plan; or (ii) if the Class 3 claimant objects to such rate in writing and serves a copy of such objection on the Debtor at least fifteen (15) days prior to the commencement of the confirmation hearing, such rate will be determined by the Court as necessary to satisfy the requirements of 11 U.S.C. §1129(b) of the Code; or (iii) such other rate as agreed by the Debtor and the Class 3 claimant;

11

   c. The Class 3 claimant will retain all liens that secured its Claim as of the Petition Date;

   d. The Class 3 Claim shall be amortized and paid in equal monthly installments over a five-year period following the Effective Date of the Plan beginning the first full month following the Effective Date of the Plan;

   e. The Debtor shall be entitled to prepay the Class 3 Claim without premium or penalty; and

   f. Based upon the interest rate and amortization period, the Class 3 monthly payment will be approximately $552.50.

6.4 - **CLASS 4. U.S. Bank d/b/a U.S. Equipment Finance.** The Class 4 Secured Claim consist of the Allowed Secured Claim of U.S. Bank d/b/a U.S. Equipment Finance ("U.S. Bank").  On or about December 12, 2019, the Debtor entered into an Equipment Finance Agreement with Choice Health Financial for the purchase of Cerec Primescan AC and Solea Laser, pursuant to which the Debtor granted Choice Health Financial a lien on the equipment.  Upon information and belief, the loan was transferred to U.S. Bank sometime in or around January 2020.  The Class 4 Secured Claim is impaired by this Plan.  The Class 4 Secured Claim will be treated and paid as follows:

   a. The principal amount of the Class 4 Claim will be allowed in the amount of $75,000.  The remainder of Class 4 Claim will be deemed unsecured pursuant to 11 U.S.C. § 506 and treated as a Class 7 general unsecured claim;

   b. The Class 4 Claim will bear interest at the rate of: (i) 4.0% per annum commencing on the Effective Date of the Plan; or (ii) if the Class 4 claimant objects to such rate in writing and serves a copy of such objection on the Debtor at least fifteen (15) days prior to the commencement of the confirmation hearing, such rate will be determined by the Court as necessary to satisfy the requirements of 11 U.S.C. §1129(b) of the Code; or (iii) such other rate as agreed by the Debtor and the Class 4 claimant;

   c. The Class 4 claimant will retain all liens that secured its Claim as of the Petition Date;

   d. The Class 4 Claim shall be amortized and paid in equal monthly installments over a six-year period following the Effective Date of the Plan beginning the first full month following the Effective Date of the Plan;

e.      The Debtor shall be entitled to prepay the Class 4 Claim without premium or penalty; and

f.      Based upon the interest rate and amortization period, the Class 4 monthly payment will be approximately $1,173.39.

6.5 -   **CLASS 5. FC Marketplace.** The Class 5 Secured Claim consists of the Allowed Secured Claim held by FC Marketplace, and secured by a lien on the Debtor's assets. The Class 5 Secured Claim is impaired by this Plan.  The Class 5 Claim shall be treated and paid as follows:

a.      The principal amount of the Class 5 Claim will be allowed in the amount of $100,000;

b.      The Class 5 Claim will bear interest at the rate of: (i) 4.0% per annum commencing on the Effective Date of the Plan; or (ii) if the Class 5 claimant objects to such rate in writing and serves a copy of such objection on the Debtor at least fifteen (15) days prior to the commencement of the confirmation hearing, such rate will be determined by the Court as necessary to satisfy the requirements of 11 U.S.C. §1129(b) of the Code; or (iii) such other rate as agreed by the Debtor and the Class 5 claimant;

c.      The Class 5 claimant will retain all liens that secured its Claim as of the Petition Date;

d.      The Class 5 Claim shall be amortized and paid in equal monthly installments over a six-year period following the Effective Date of the Plan beginning the first full month following the Effective Date of the Plan;

e.      The Debtor shall be entitled to prepay the Class 5 Claim without premium or penalty; and

f.      Based upon the interest rate and amortization period, the Class 5 monthly payment will be approximately $1,564.52.

6.6 -   **CLASS 6. On Deck.** The Class 6 Secured Claim consists of the Allowed Secured Claim held by On Deck.  On Deck filed a UCC-1 Financing Statement with the Colorado Secretary of State through their corporate representative, CHTD Company on October 5, 2020, and further filed a Proof of Claim asserting a secured claim on April 30,

13

2020 (Claim No. 9).  However, the Business Loan and Security Agreement Supplement, incorporated by reference in to the Business Loan and Security Agreement, that provides the terms of the loan from On Deck expressly provides that the Debtor granted On Deck "a seven day security interest in" certain of the Debtor's assets.  As such the Debtor disputes that On Deck's claim is secured and, even to the extent a subsequent security interest was granted, it was not timely perfected.  The Class 6 Claim is impaired by this Plan.  The Class 6 Claim shall be determined to be unsecured pursuant to 11 U.S.C. § 506 on the Effective Date of the Plan, as the value of the collateral securing the claim does not exceed the amount of the Class 2 or Class 5 Secured Claims.  The amount of the Class 6 Claim shall be allowed in the amount owed on the Effective Date of the Plan and treated as a Class 7 general unsecured claim.

6.7 - **CLASS 7.  General Unsecured Claims**.  Class 7 consists of those unsecured creditors of the Debtor who hold Allowed Claims that were either scheduled by the Debtor as undisputed, or subject to timely filed proofs of claim to which the Debtor does not successfully object.  A list of the Class 7 Claimants is attached hereto as Exhibit A.  As set forth on Exhibit A, the total Class 7 claims are $2,386,034.62.  Class 7 claimants shall receive payment of their Allowed Claims as follows:

a.      Class 7 shall receive a pro-rata distribution of a variable percentage of the Debtor's Gross Revenue generated over a three-year period commencing on the earlier of: a) the first day of the first full month after all Professional Fee Claims are paid in full; or b) the first day of sixth month following the Effective Date of the Plan  ("Repayment Term");

b.      The variable percentage of Gross Revenue paid to Class 8 creditors shall be equal to: a) 2% of the Gross Revenue generated during the first year of the Repayment Term; b) 4% of Gross Revenue generated during the second year of the repayment term; and c) 5% of Gross Revenue generated during the third year of the repayment term.  Commencing on the first month during the Repayment Term, the Debtor shall, at the conclusion of each month, set aside in a segregated account an amount equal to the requisite percentage of the preceding month's Gross Revenue ("Distribution Amount") which shall be distributed to Class 7 creditors on a pro-rata basis every six (6) months thereafter during the Repayment

14

Term.  No interest will be paid on account of Class 7 claims.  For the avoidance of a doubt, no creditor shall receive more than 100% of their allowed claim from payments on account of their Class 7 Claim and payments from any plan confirmed in Dr. Craig's bankruptcy case.

c.      In addition to the above payments, Class 7 shall receive a pro-rata distribution of all of the net proceeds of any Avoidance Action brought by the Debtor, less reasonable costs and attorneys' fees incurred by the Debtor to pursue the claim through litigation, settlement, and/or collection.  The Debtor does not believe any such claims exist.

d.      Based on the Debtor's projections, attached hereto as Exhibit B, the Debtor estimates that the following amounts will be paid on account of Class 7 Claims:

| Year | Summary |
|------|---------|
| 2021 | $31,000 |
| 2022 | $80,600 |
| 2023 | $112,300 |
| 2024 | $31,500 |
| **Total** | **$255,400** |

e.      Based on the estimated distributions, Class 7 Claimants are anticipated to receive approximately 11% of their allowed claims. Upon request by any party in interest, the Debtor shall provide a quarterly financial statement, including amounts disbursed to creditors in accordance with the Plan.

f.      As additional security for Class 7 unsecured creditors, on the Effective Date of the Plan, the Dr. Craig shall designate the Debtor as the primary beneficiary under his life insurance policy(ies) up to the anticipated amounts to be paid under the Plan as set forth above.  In the event that the life insurance benefits become due and payable, the executor of Dr. Craig's estate or accountant managing the Debtor's books and records at such time shall be empowered to make distributions of such life insurance benefits in accordance with this Plan.

6.8 -   **CLASS 8. Claims Held by the Bankruptcy Estate of James Craig.** The Class 8 Claim consists of the unsecured claim held by the Bankruptcy Estate of James

15

Craig. Dr. James Craig filed his voluntary petition pursuant to Chapter 11 of the Bankruptcy Code on July 1, 2020. Within one year prior to filing, Dr. Craig transferred Troptions.gold and XTroptions.gold cryptocurrency to the Debtor as satisfaction for the loans previously extended to Dr. Craig by the Debtor. The transfer created an avoidable preference in accordance with 11 U.S.C. § 547. The Debtor is still in possession of the cryptocurrency it received from Dr. Craig.

On the Effective Date of the Plan, the Debtor will return all cryptocurrency transferred to Debtor on a pre-petition basis as satisfaction in full of any and all claims arising under 11 U.S.C. §§ 544, 547, 548, and 549.

6.9 -   **CLASS 9. Interests in Summerbrook.** Class 9 includes Interests in the Debtor held by Dr. Craig. Class 9 is unimpaired by this Plan. On the Effective Date of the Plan, Class 9 shall retain its Interests in the Debtor.

Because the Debtor is a professional limited liability company and provides medical services, only dentists can hold ownership interests in the Debtor. As such, while Dr. Craig is retaining his interest in the Debtor, Dr. Craig's interest has no value to creditors or third parties.

## VII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1 -   The Debtor assumes, the following executory contracts and unexpired leases as of the Effective Date:

    a.   All contracts and leases previously assumed or for which a motion to assume is pending;

    b.   All leases and contracts that are not specifically rejected, including insurance contracts.

7.2 -   The Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases for which a motion to reject has been granted or is pending as of the Effective Date. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than **45** days after the date of the order confirming this Plan.

## VIII.   FEASIBILITY OF THE PLAN

The Debtor's Plan is feasible based upon the Debtor's prepared projections, attached

16

hereto as Exhibit B, which reflect a conservative prediction of the Debtor's operations during the term of the Plan.  As evidenced by the projections, the Debtor anticipates it will generate sufficient revenue to meet its obligations under the Plan.   The Debtor has used its best efforts to prepare accurate projections.  The Debtor's actual income will fluctuate based on changes in the market.  While the Debtor's projections initially show negative income due to the lingering effects of COVID-19 on the Debtor's business operations, the Debtor anticipates that it will be able to cover these losses with funds from additional relief programs, including the recently approved second round of PPP loans and programs targeted towards small businesses.

The Debtor has based payments to Class 7 Unsecured Creditors on Gross Revenue to further support the feasibility of the Plan.  As the Debtor's revenue fluctuates, the amount set aside for creditors will fluctuate as well, but the Debtor will not be overburdened with fixed debt payments.  Additionally, while the Debtor's projections show excess funds at the end of the Plan term, the additional funds are necessary to ensure that the Debtor can pay for any unanticipated expenses, including replacing ageing or defective equipment, and to ensure that the Debtor has sufficient funds to pay the balloon payment due to Independent Bank in 2026.

Post-petition, the Debtor's revenue has been negatively impacted by the COVID-19 pandemic, which resulted in the closure of the business for several months, and caused a substantial loss of revenue for the Debtor after the implementation of the Stay-at-Home Order issued by Governor Polis for the State of Colorado, delaying the Debtor's reorganization efforts.   As Colorado's Stay-at-Home Order expired, and restrictions on business operations have lifted, the Debtor has again seen an increase in patients, although the Debtor also anticipates a drop in revenue for a short period of time in later 2020 and early 2021 due to a necessary medical procedure that Dr. Craig will undergo in December. Based on the prior performance of the business, the Debtor anticipates that once it gets past these issues, it will be able to meet or exceed the revenue projected under the Plan.

## IX.    <u>LIQUIDATION ANALYSIS</u>

The principal alternative to a Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code.  Chapter 7 requires the liquidation of the Debtor's assets by a Trustee who is appointed by the United States Trustee's office.  In a Chapter 7 case, the

Chapter 7 Trustee would take over control of the Debtor's assets. The assets would be liquidated and the proceeds distributed to creditors in the order of their priorities.

As set forth on the Liquidation Analysis attached hereto as Exhibit C, if the Debtor's case were converted to a case under Chapter 7, the sale of the assets would be insufficient to pay the secured claims in full. As a result, the first and second position secured creditors, FC Marketplace d/b/a Funding Circle and Independent Bank, would likely seek relief from stay to foreclose on the assets, and the unsecured creditors would receive nothing in a Chapter 7. While Independent Bank likely does not have a lien on the Debtor's cryptocurrency, the cryptocurrency cannot be sold and therefore does not have any value. As such, creditors would likely not receive anything on account of their claims in a Chapter 7. In contrast, the Debtor's Plan provides that unsecured creditors would receive approximately 11% of their allowed claims over the Repayment Term. **It is only through confirmation of the Plan that unsecured creditors will receive anything on account of their claims.**

In the alternative, the Chapter 7 Trustee seeks to avoid Independent Bank's lien, the Chapter 7 would have to expend significant funds to fully litigate any avoidance claims, and the outcome would be highly speculative, and would result in the Trustee incurring significant administrative expenses that would be paid out of any recovery by the estate. Even if a Chapter 7 Trustee did prevail in avoidance action, and avoided Independent Bank's lien in its entirety, unsecured creditors would only receive 8% of their claims.

The Debtor's Plan provides the best alternative to unsecured creditors. The Debtor's Plan is anticipated to pay unsecured creditors approximately 11% of their allowed claims. As such, confirmation of the Debtor's Plan is in the best interests of creditors.

## X.   TAX CONSEQUENCE

The Debtor is not providing tax advice to creditors or interest holders. **U.S. Treasury Regulations require you to be informed that, to the extent this section includes any tax advice, it is not intended or written by the Debtor or its counsel to be used, and cannot be used, for the purpose of avoiding federal tax penalties.** Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation. Generally, unsecured creditors should have no tax

impact as a result of Plan confirmation. The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year in which case income may have to be recognized. Interest holders may have very complicated tax effects as a result of Plan confirmation.

## XI.   **IMPLEMENTATION OF THE PLAN**

11.1 - **Effectuating the Plan.** On the Effective Date of the Plan, Dr. James Craig shall be appointed pursuant to 11 U.S.C.§1142(b) for the purpose of carrying out the terms of the Plan, and taking all actions deemed necessary or convenient to consummating the terms of the Plan.

11.2 - **Effective Date.** The Plan will become effective on the date the Bankruptcy Court enters its Order confirming the Plan and said Order becomes final and non-appealable (the "Effective Date").

11.3 - **Disputed Claims.** Any claimant or the Debtor may file an objection to any claim no later than 45 days following the Effective Date. The Debtor shall have standing to commence, prosecute, and settle claim objections, and avoidance actions without need for Court approval. The Debtor does not believe there are any avoidance actions in this case.

11.4 - **Administrative Expense Bar Date.** Any creditor seeking allowance and payment of an administrative expense priority claim must do so no later than 45 days following the entry of the Order confirming the Plan.

11.5 - **Final Decree.** The Debtor will request entry of a final decree within 180 days of the Effective Date.

11.6 - **Discharge.** If the Debtor's Plan is confirmed under § 1191(a), on the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

(i) imposed by this Plan; or
(ii) to the extent provided in § 1141(d)(6).

If the Debtor's Plan is confirmed through a nonconsensual confirmation under § 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Code, and the creditors' rights in the event of default may be greater.

The Debtor will not be discharged from any debt:

  (i) on which the last payment is due after the first 3 years of the plan, or as otherwise provided in § 1192; or

  (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

11.7 - **Contractual Relationship & Default.** The Plan, upon confirmation, constitutes a new contractual relationship by and between the Debtor and its creditors. In the event of a default by the Debtor under the Plan, including failure to timely file and pay any post-petition taxes, creditors shall be entitled to enforce all rights and remedies against the Debtor for breach of contract, the Plan. Any secured creditor claiming a breach of the Plan by the Debtor will be able to enforce all of their rights and remedies including foreclosure of their deed of trust, security agreement, lien, or mortgage pursuant to the terms of such document. Any creditor claiming a breach by the Debtor must provide written notice to the Debtor and counsel for the Debtor of the claimed default, the notice must provide the Debtor a ten (10) day period within which to cure the claimed default, unless a longer period is specified elsewhere in the Plan. Upon the Debtor's failure to cure the default within such ten-day period, the creditor may proceed to exercise their rights and remedies under applicable State and Federal Law, including seeking to enforce the terms of the Plan or conversion of the Debtor's case to a case under Chapter 7.

11.8 - In the event the Debtor's Plan is confirmed through a nonconsensual confirmation under 11 U.S.C. § 1191(b), creditors may have greater rights in the event of default, as debts are not discharged until the completion of all payments due within the first three years of the Plan.

11.9 - **Executory Contracts and Unexpired Leases.** All executory contracts and unexpired leases which were entered into by the Debtor pre-petition, and not assumed by order of the Bankruptcy Court, are assumed as of the Effective Date of the Plan.

11.10 - **Revestment.** The entry of an Order confirming this Plan shall revest in the Debtor all property of the estate free and clear of all liens except those specifically set forth in the Plan.

11.11 - **Retention of Jurisdiction**. Notwithstanding confirmation of the Plan, the Court shall retain jurisdiction for the following purposes:

  a. Determination of the allowability of claims upon objection to such claims by the Debtor-in-Possession or by any other party in interest;

20

b.      Determination of the request for payment of claims entitled to priority under 11 U.S.C. Section 507(a)(1), including compensation of the parties entitled thereto;

c.      Resolution of any disputes regarding interpretation of the Plan;

d.      Implementation of the provisions of the Plan and entry of orders in aid of consummation of the Plan, including without limitation, appropriate orders to protect the revested Debtor from action by creditors;

e.      Modification of the Plan pursuant to 11 U.S.C. §1193;

f.      Adjudication of any causes of action, including avoiding powers actions, brought by the Debtor-in-Possession, by the representative of the estate or by a Trustee appointed pursuant to the Code;

g.      Adjudication of any cause of action brought by the Debtor-in-Possession, by a representative of the estate, or by a Trustee appointed pursuant to the Code, or the revested Debtor exercising rights and powers as provided in 11 U.S.C. §542-549.  This section shall not be construed to limit any other power or right which the Debtor may possess under any section of the Code; and

h.      Entry of a final decree.

11.12 -  **Satisfaction of Claims.**  Except as otherwise required by or provided in this Plan, the Debtor shall receive a discharge on the confirmation date pursuant to Section 1141(d). Confirmation of the Plan shall constitute a modification of any note or obligation for which specification and treatment is provided under the Plan as set forth in the Plan.  Any obligation or note, previously in default, so modified, shall be cured as modified as of the Confirmation Date. This provision shall be operable regardless of whether the Plan provides for any obligation to be evidenced by a rewritten loan or security document following confirmation of the Plan.

11.13 -  **Headings**.  The headings used in the Plan are for convenience of reference only and shall not limit or in any manner affect the meaning or interpretation of the Plan

11.14 -  **Notices.**  All notices, requests, demands, or other communications required or permitted in this Plan must be given in writing to the party(ies) to be notified.  All communications will be deemed delivered when received at the following addresses:

21

a.   Summerbrook Dental Group, PLLC
c/o Dr. James Craig
6795 S. Robertsdale Way
Aurora, CO 80016

With a copy to:
Keri L. Riley, Esq.
Kutner Brinen, P.C.
1660 Lincoln St., Suite 1850
Denver, CO 80264
Fax: 303-832-1510
Email:klr@kutnerlaw.com

b.   To an allowed claimant, at the addresses set forth in the allowed Proof of
Claim, if filed, otherwise, at the address set forth for the claimant in the
Debtor's schedules filed with the Court.

c.   To the IRS, by fax to the attention of Troy Blair at (855) 716-0613, or to the
attention of Sal Rivera at (855)276-0907.

11.15 - **Unclaimed Payments**.  If a person or entity entitled to receive a payment
or distribution pursuant to this Plan, exclusive of the IRS, fails to negotiate a check,
accept a distribution or leave a forwarding address in the event notice cannot be provided
as set forth in paragraph 14, within one (1) year of the Effective Date of the Plan, the
person or entity is deemed to have released and abandoned any right to payment or
distribution under the Plan.

11.16 - **Subchapter V Trustee and Plan Payments**.  If this Plan is confirmed
pursuant to 11 U.S.C. § 1191(a), the Trustee's services shall be terminated at such time
as the Plan has been substantially consummated.  If the Plan is confirmed pursuant to 11
U.S.C. § 1191(b), the Trustee shall continue to serve as Trustee, and shall accept Plan
payments from the Debtor and convey said payments as provided herein.

11.17 - **Substantial Consummation**. Pursuant to 11 U.S.C. § 1183(c)(2), within
fourteen (14) days after the Plan has been substantially consummated, the Debtor shall
file a notice of the same with the Court, and serve the Subchapter V trustee, the United
States trustee, and all parties in interest.

22

## XII.    CONFIRMATION REQUEST

The Debtor, as proponent of the Plan, requests confirmation of the Plan pursuant to 11 U.S.C. §1191(a).  The Court may confirm the Plan pursuant to § 1191(b) if it does not discriminate unfairly and is fair and equitable with respect to each class of Claims or Interests that is impaired under, and has not accepted, the Plan.


DATED:  January 4, 2021                 **SUMMERBROOK DENTAL GROUP, PLLC**

                                        By: _s/  James Craig_____
                                             James Craig, DDS President

APPROVED AS TO FORM:

_s/ Keri L. Riley_____
Keri L. Riley, #47605
Kutner Brinen, P.C.
1660 Lincoln St., Suite 1850
Denver, CO 80264
Telephone:  303- 832-2400
Fax: 303-832-1510
Email: klr@kutnerlaw.com

ATTORNEYS FOR SUMMERBROOK DENTAL GROUP, PLLC
DEBTOR AND DEBTOR-IN-POSSESSION

# APPENDIX

## DEFINITIONS

Administrative Claim shall mean a Claim for payment of an administrative expense of a kind specified in § 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to § 507(a)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estate and operating the business of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) Professional Fee Claims; (c) all fees and charges assessed against the estates under 28 U.S.C. § 1930; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under § 546(c)(2) of the Bankruptcy Code.

Allowed Claim shall mean a claim in respect of which a Proof of Claim has been filed with the Court within the applicable time period of limitation fixed by Court Order in this case or scheduled in the list of creditors prepared and filed with the Court pursuant to Bankruptcy Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, in either case as to which no timely objection to the allowance thereof has been filed pursuant to Bankruptcy Rules 3001 and 3007 or as to which any such objection has been determined by a Final Order.

Allowed Secured Claim shall mean an allowed claim secured by a lien, security interest or other charge against or interest in property in which the Debtor has an interest, or which is subject to setoff under § 553 of the Code, to the extent of the value (determined in accordance with § 506(a) of the Code) of the interest of the holder of any such allowed claim and the Debtor's interest in such property or to the extent of the amount subject to such setoff as the case may be.

Avoidance Actions means each Debtor's estate's interest in any and all Claims, rights and causes of action which have been or may be commenced by or on behalf of the Debtor to avoid and recover any transfers of property determined to be preferential, fraudulent or otherwise avoidable pursuant to §§ 544, 545, 547, 548, 549, 550 or 553 of

24

the Bankruptcy Code, or under any other applicable law, or otherwise subject to equitable subordination under §510 of the Bankruptcy Code, regardless of whether or not such actions have been commenced prior to the Effective Date.

Claim shall mean any right to payment, or right to any equitable remedy for breach of performance if such breach gives rise to the right to payment, against the Debtor in existence on or as of the Petition Date, whether or not such right to payment or right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured or unsecured.

Class shall mean any Class into which Allowed Claims are classified pursuant to Article III.

Class 1-8 and Claims and Interests shall mean the Allowed Claims and Interests so classified in Part III.

Code shall mean the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* and any amendments thereof.

Confirmation Date shall mean the date upon which the Order of Confirmation is entered by the Court.

Court shall mean the United States Bankruptcy Court for the District of Colorado in which the Debtor's Chapter 11 case is pending, pursuant to which this Plan is proposed, and any Court having competent jurisdiction to hear appeal or certiorari proceedings therefrom.

Disputed Claim shall mean any Claim which is not an Allowed Claim, including, without limitation, any Claim designated as disputed, contingent or unliquidated in Debtor's schedules filed in connection with this case, or any Claim against which an objection to the allowance thereof has been interposed, and as to which no Final Order has been entered.

Effective Date of the Plan shall mean fourteen days after the date on which the Order of Confirmation is entered or if a stay is entered pending appeal of the Order of Confirmation, the date on which the stay is no longer in effect.

Gross Revenue shall mean all gross cash receipts of the Debtor for any given time period, less all taxes collected by the Debtor from customers (i.e. sales taxes).

25

Order of Confirmation shall mean the Order entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Code.

Petition Date shall mean the date on which the voluntary petition was filed by the Debtor on February 21, 2020.

Plan shall mean this Plan of Reorganization, as amended in accordance with the terms hereof or modified in accordance with the Code, including all exhibits and schedules attached hereto or referenced herein or therein.

Priority Claim shall mean any pre-petition Claim entitled to a priority in payment under § 507(a) of the Code, but shall not include any Administrative Claim or Tax Claim.

Professional Fees shall mean the Administrative Claims for compensation and reimbursement submitted pursuant to Section 330, 331 and 503(b) of the Code by a Professional Person.

Rules shall mean the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules for the District of Colorado as adopted by the Court.

Tax Claim shall mean any unsecured Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. § 507(a)(8).

Unclassified Priority Claims shall mean Claims pursuant to Section 507(a)(2) which are Administrative Claims allowed under Section 503(b) of the Code and any fees and charges against the estate under Chapter 123 of Title 28 of the United States Code and shall further mean Allowed Unsecured Claims of governmental units to the extent provided for in Section 507(a)(8) of the Code.

Other Definitions. Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan but that is defined in the Code or Rules shall have the meaning set forth therein

Exhibit A

Summerbrook Dental Group, PLLC

Exhibit A

| Name | Amount on Schedule F | Proof of Claim | Amount for the Purposes of Class 7 |
|---|---|---|---|
| LG Funding, LLC | Unknown | $158,989.83 (Claim No. 2) | $ 158,989.83 |
| CT Corporation System | Unknown | n/a | $ - |
| On Deck Capital | $ - | $253,051.10 (Claim No. 9) | $ 253,051.10 |
| National Funding (NFAS, LLC) | $ - | $72,352.16 (Claim No. 10) | $ 72,352.16 |
| Kabbage | $ 71,420.00 | 0 | $ - |
| Headway Capital | $ - | 0 | $ - |
| Dentascope | $ 5,000.00 | 0 | $ 5,000.00 |
| Choice Health Finance | $ 205,021.80 | 0 | $ 205,021.80 |
| Blue Vine | Unk | 0 | $ - |
| BHG Credit Card | $ 18,537.56 | $17,542.79 (Claim No. 1) | $ 17,542.79 |
| BFB, Inc. | $ 100,000.00 | 0 | $ 100,000.00 |
| Behalf | $ 2,500.00 | 0 | $ 2,500.00 |
| American Express | $ 138,074.67 | $138,074.67 (Claim No. 4) | $ 138,074.67 |
| Align Technology, Inc. | $ 2,154.00 | n/a | $ 2,154.00 |
| Wells Fargo Bank, N.A. | n/a | $10,000 (Claim No. 6) | $ 10,000.00 |
| Independent Bank (deficiency claim) | | | $ 1,251,088.31 |
| US Bank (deficiency claim) | n/a | | $ 170,259.96 |
| | | **Total** | **$ 2,386,034.62** |

Exhibit B

Summerbrook Dental Group PLLC

| | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 |
|---|---|---|---|---|---|---|---|---|---|
| Starting Balance | $ 88,235.07 | $ 39,030.36 | $ 22,324.65 | $ 19,950.53 | $ 14,175.41 | $ 8,399.29 | $ 2,622.17 | $ (8,155.95) | $ (18,935.07) |
| Income | | | | | | | | | |
| Patient Refunds | -2,000.00 | -2,000.00 | -4,000.00 | -4,000.00 | -4,000.00 | -4,000.00 | -4,000.00 | -4,000.00 | -4,000.00 |
| Practice Income | | | | | | | | | |
| Service Sales | 120,000.00 | 145,000.00 | 170,000.00 | 170,000.00 | 170,000.00 | 170,000.00 | 170,000.00 | 170,000.00 | 170,000.00 |
| Total Practice Income | $ 120,000.00 | $ 145,000.00 | $ 170,000.00 | $ 170,000.00 | $ 170,000.00 | $ 170,000.00 | $ 170,000.00 | $ 170,000.00 | $ 170,000.00 |
| Total Income | $ 118,000.00 | $ 143,000.00 | $ 166,000.00 | $ 166,000.00 | $ 166,000.00 | $ 166,000.00 | $ 166,000.00 | $ 166,000.00 | $ 166,000.00 |
| Cost of Goods Sold | | | | | | | | | |
| Supplies and Laboratories | | | | | | | | | |
| Dental/Implant Supplies | 10,000.00 | 12,500.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 |
| Implant Supplies | | | | | | | | | |
| Lab Expense | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| Total Supplies and Laboratories | $ 15,000.00 | $ 17,500.00 | $ 21,000.00 | $ 21,000.00 | $ 21,000.00 | $ 21,000.00 | $ 21,000.00 | $ 21,000.00 | $ 21,000.00 |
| Total Cost of Goods Sold | $ 15,000.00 | $ 17,500.00 | $ 21,000.00 | $ 21,000.00 | $ 21,000.00 | $ 21,000.00 | $ 21,000.00 | $ 21,000.00 | $ 21,000.00 |
| Gross Profit | $ 103,000.00 | $ 125,500.00 | $ 145,000.00 | $ 145,000.00 | $ 145,000.00 | $ 145,000.00 | $ 145,000.00 | $ 145,000.00 | $ 145,000.00 |
| Expenses | | | | | | | | | |
| Continuing Education | | | | | | | | | |
| Professional Development | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Travel Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Continuing Education | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| Facilities Expenses | | | | | | | | | |
| Equipment Rent/Lease | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| Health Care Compliance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Janitorial Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Office Expense | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Office Rent | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| Repairs & Maintenance | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Utilities | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| Total Facilities Expenses | $ 12,500.00 | $ 12,500.00 | $ 12,500.00 | $ 12,500.00 | $ 12,500.00 | $ 12,500.00 | $ 12,500.00 | $ 12,500.00 | $ 12,500.00 |
| G & A Expenses | | | | | | | | | |
| Automobile Expense | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| Bank/Merchant Service Charges | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 |
| Business Licenses and Permits | | | | | | | | | |
| Collection Expenses | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| Computer and Internet Expenses | 2,708.61 | 2,708.61 | 2,708.61 | 2,708.61 | 2,708.61 | 2,708.61 | 2,708.61 | 2,708.61 | 2,708.61 |
| Consulting Expenses | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| Dues and Subscriptions | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| Insurance Expense | | | | | | | | | |

Summerbrook Dental Group PLLC

| | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 |
|---|---|---|---|---|---|---|---|---|---|
| **Malpractice Insurance** | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| **Other Business Insurance** | | | | | | | | | |
| **Legal & Professional Fees** | 3,083.00 | 3,083.00 | 3,083.00 | 3,083.00 | 3,083.00 | 3,083.00 | 3,083.00 | 3,083.00 | 3,083.00 |
| **Meals and Entertainment** | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| **Office Supplies** | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| **Parking & Tolls** | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Postage & Shipping** | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 |
| **Printing** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Software Expense** | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| **Taxes** | | | | | | | | | |
| **Property Tax** | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 |
| **Sales & Use Tax** | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 |
| **Telephone Expense** | 1,128.00 | 1,129.00 | 1,130.00 | 1,131.00 | 1,132.00 | 1,133.00 | 1,134.00 | 1,135.00 | 1,136.00 |
| **Total G & A Expenses** | $ 19,269.61 | $ 19,270.61 | $ 19,271.61 | $ 19,272.61 | $ 19,273.61 | $ 19,274.61 | $ 19,275.61 | $ 19,276.61 | $ 19,277.61 |
| **Marketing Expenses** | | | | | | | | | |
| **External Advertising** | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 |
| **Internal Advertising** | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 |
| **Total Marketing Expenses** | $ 12,600.00 | $ 12,600.00 | $ 12,600.00 | $ 12,600.00 | $ 12,600.00 | $ 12,600.00 | $ 12,600.00 | $ 12,600.00 | $ 12,600.00 |
| **Team Expenses** | | | | | | | | | |
| **Contract Labor** | | | | | | | | | |
| **Dr Stacey Cha** | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 |
| **Heather Alcantara** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Other Contract Labor/Hygiene** | 10,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Contract Labor** | $ 30,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 |
| **Payroll Expenses** | | | | | | | | | |
| **Employee Health Insurance** | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| **Other Employee Benefits** | | | | | | | | | |
| **Payroll Processing Fees** | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 |
| **Payroll Tax Expense** | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
| **Wage Expense** | | | | | | | | | |
| **Salary - Employees** | 35,000.00 | 35,000.00 | 35,000.00 | 35,000.00 | 35,000.00 | 35,000.00 | 40,000.00 | 40,000.00 | 40,000.00 |
| **Total Payroll Expenses** | $ 51,600.00 | $ 51,600.00 | $ 51,600.00 | $ 51,600.00 | $ 51,600.00 | $ 51,600.00 | $ 56,600.00 | $ 56,600.00 | $ 56,600.00 |
| **Total Team Expenses** | $ 81,600.00 | $ 71,600.00 | $ 71,600.00 | $ 71,600.00 | $ 71,600.00 | $ 71,600.00 | $ 76,600.00 | $ 76,600.00 | $ 76,600.00 |
| **Total Expenses** | $ 125,969.61 | $ 115,970.61 | $ 115,971.61 | $ 115,972.61 | $ 115,973.61 | $ 115,974.61 | $ 120,975.61 | $ 120,976.61 | $ 120,977.61 |
| **Net Operating Income** | -$ 22,969.61 | $ 9,529.39 | $ 29,028.39 | $ 29,027.39 | $ 29,026.39 | $ 29,025.39 | $ 24,024.39 | $ 24,023.39 | $ 24,022.39 |
| **Other Income** | | | | | | | | | |
| **Interest Income** | 6.00 | 7.00 | 8.00 | 9.00 | 10.00 | 11.00 | 12.00 | 13.00 | 14.00 |
| **Total Other Income** | $ 6.00 | $ 7.00 | $ 8.00 | $ 9.00 | $ 10.00 | $ 11.00 | $ 12.00 | $ 13.00 | $ 14.00 |

Summerbrook Dental Group PLLC

| | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 |
|---|---|---|---|---|---|---|---|---|---|
| **Other Expenses** | | | | | | | | | |
| **Interest Expense** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Owner's Expenses** | | | | | | | | | |
| **Charitable Donations** | | | | | | | | | |
| **Distributions** | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 |
| **Officer Disability Insurance** | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 |
| **Officer Health Insurance** | 1,888.10 | 1,888.10 | 1,888.10 | 1,888.10 | 1,888.10 | 1,888.10 | 1,888.10 | 1,888.10 | 1,888.10 |
| **Officer Life Insurance** | 4,003.00 | 4,004.00 | 4,005.00 | 4,006.00 | 4,007.00 | 4,008.00 | 4,009.00 | 4,010.00 | 4,011.00 |
| **Total Owner's Expenses** | $ 26,241.10 | $ 26,242.10 | $ 26,243.10 | $ 26,244.10 | $ 26,245.10 | $ 26,246.10 | $ 26,247.10 | $ 26,248.10 | 26,249.10 |
| **Total Other Expenses** | $ 26,241.10 | $ 26,242.10 | $ 26,243.10 | $ 26,244.10 | $ 26,245.10 | $ 26,246.10 | $ 26,247.10 | $ 26,248.10 | 26,249.10 |
| **Class 2 - Independent Bank** | | | $ 1,877.00 | $ 1,877.00 | $ 1,877.00 | $ 1,877.00 | $ 1,877.00 | $ 1,877.00 | 1,877.00 |
| **Class 3 - Byline** | | | $ 552.50 | $ 552.50 | $ 552.50 | $ 552.50 | $ 552.50 | $ 552.50 | 552.50 |
| **Class 4 - US Bank** | | | $ 1,173.39 | $ 1,173.39 | $ 1,173.39 | $ 1,173.39 | $ 1,173.39 | $ 1,173.39 | 1,173.39 |
| **Class 5 - FC Marketplace** | | | $ 1,564.52 | $ 1,564.52 | $ 1,564.52 | $ 1,564.52 | $ 1,564.52 | $ 1,564.52 | 1,564.52 |
| **Class 7 - Unsecured Claims** | | | | $ 3,400.00 | $ 3,400.00 | $ 3,400.00 | $ 3,400.00 | $ 3,400.00 | 3,400.00 |
| **Net Other Income** | -$ 26,235.10 | -$ 26,235.10 | -$ 31,402.51 | -$ 34,802.51 | -$ 34,802.51 | -$ 34,802.51 | -$ 34,802.51 | -$ 34,802.51 | -$ 34,802.51 |
| **Net Income** | -$ 49,204.71 | -$ 16,705.71 | -$ 2,374.12 | -$ 5,775.12 | -$ 5,776.12 | -$ 5,777.12 | -$ 10,778.12 | -$ 10,779.12 | -$ 10,780.12 |
| **Ending Balance** | 39,030.36 | 22,324.65 | 19,950.53 | 14,175.41 | 8,399.29 | 2,622.17 | -8,155.95 | -18,935.07 | -29,715.19 |

Summerbrook Dental Group PLLC

| | Jan-21 | Feb-21 | Oct-21 | Nov-21 | Dec-21 |
|---|---|---|---|---|---|
| **Starting Balance** | $ 88,235.07 | $ 39,030.36 | $ (29,715.19) | $ (38,413.31) | $ (47,212.43) |
| **Income** | | | | | |
| **Patient Refunds** | -2,000.00 | -2,000.00 | -4,000.00 | -4,000.00 | -5,000.00 |
| **Practice Income** | | | | | |
| **Service Sales** | 120,000.00 | 145,000.00 | 170,000.00 | 170,000.00 | 190,000.00 |
| **Total Practice Income** | $ 120,000.00 | $ 145,000.00 | $ 170,000.00 | $ 170,000.00 | $ 190,000.00 |
| **Total Income** | $ 118,000.00 | $ 143,000.00 | $ 166,000.00 | $ 166,000.00 | $ 185,000.00 |
| **Cost of Goods Sold** | | | | | |
| **Supplies and Laboratories** | | | | | |
| **Dental/Implant Supplies** | 10,000.00 | 12,500.00 | 16,000.00 | 16,000.00 | 18,000.00 |
| **Implant Supplies** | | | | | |
| **Lab Expense** | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| **Total Supplies and Laboratories** | $ 15,000.00 | $ 17,500.00 | $ 21,000.00 | $ 21,000.00 | $ 23,000.00 |
| **Total Cost of Goods Sold** | $ 15,000.00 | $ 17,500.00 | $ 21,000.00 | $ 21,000.00 | $ 23,000.00 |
| **Gross Profit** | $ 103,000.00 | $ 125,500.00 | $ 145,000.00 | $ 145,000.00 | $ 162,000.00 |
| **Expenses** | | | | | |
| **Continuing Education** | | | | | |
| **Professional Development** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Travel Expense** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Continuing Education** | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| **Facilities Expenses** | | | | | |
| **Equipment Rent/Lease** | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| **Health Care Compliance** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Janitorial Expense** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Office Expense** | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| **Office Rent** | 7,500.00 | 7,500.00 | 7,500.00 | 7,600.00 | 7,600.00 |
| **Repairs & Maintenance** | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| **Utilities** | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| **Total Facilities Expenses** | $ 12,500.00 | $ 12,500.00 | $ 12,500.00 | $ 12,600.00 | $ 12,600.00 |
| **G & A Expenses** | | | | | |
| **Automobile Expense** | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| **Bank/Merchant Service Charges** | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 |
| **Business Licenses and Permits** | | | | | |
| **Collection Expenses** | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Computer and Internet Expenses** | 2,708.61 | 2,708.61 | 2,708.61 | 2,708.61 | 2,708.61 |
| **Consulting Expenses** | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| **Dues and Subscriptions** | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 |
| **Insurance Expense** | | | | | |

Summerbrook Dental Group PLLC

| | Jan-21 | Feb-21 | Oct-21 | Nov-21 | Dec-21 |
|---|---|---|---|---|---|
| **Malpractice Insurance** | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| **Other Business Insurance** | | | | | |
| **Legal & Professional Fees** | 3,083.00 | 3,083.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| **Meals and Entertainment** | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| **Office Supplies** | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| **Parking & Tolls** | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Postage & Shipping** | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 |
| **Printing** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Software Expense** | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 |
| **Taxes** | | | | | |
| **Property Tax** | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 |
| **Sales & Use Tax** | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 |
| **Telephone Expense** | 1,128.00 | 1,129.00 | 1,137.00 | 1,138.00 | 1,139.00 |
| **Total G & A Expenses** | $ 19,269.61 | $ 19,270.61 | $ 17,195.61 | $ 17,196.61 | $ 17,197.61 |
| **Marketing Expenses** | | | | | |
| **External Advertising** | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 |
| **Internal Advertising** | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 |
| **Total Marketing Expenses** | $ 12,600.00 | $ 12,600.00 | $ 12,600.00 | $ 12,600.00 | $ 12,600.00 |
| **Team Expenses** | | | | | |
| **Contract Labor** | | | | | |
| **Dr Stacey Cha** | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 |
| **Heather Alcantara** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Other Contract** | | | | | |
| **Labor/Hygiene** | 10,000.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Contract Labor** | $ 30,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 | $ 20,000.00 |
| **Payroll Expenses** | | | | | |
| **Employee Health Insurance** | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| **Other Employee Benefits** | | | | | |
| **Payroll Processing Fees** | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 |
| **Payroll Tax Expense** | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
| **Wage Expense** | | | | | |
| **Salary - Employees** | 35,000.00 | 35,000.00 | 40,000.00 | 40,000.00 | 40,000.00 |
| **Total Payroll Expenses** | $ 51,600.00 | $ 51,600.00 | $ 56,600.00 | $ 56,600.00 | $ 56,600.00 |
| **Total Team Expenses** | $ 81,600.00 | $ 71,600.00 | $ 76,600.00 | $ 76,600.00 | $ 76,600.00 |
| **Total Expenses** | $ 125,969.61 | $ 115,970.61 | $ 118,895.61 | $ 118,996.61 | $ 118,997.61 |
| **Net Operating Income** | -$ 22,969.61 | $ 9,529.39 | $ 26,104.39 | $ 26,003.39 | $ 43,002.39 |
| **Other Income** | | | | | |
| **Interest Income** | 6.00 | 7.00 | 15.00 | 16.00 | 17.00 |
| **Total Other Income** | $ 6.00 | $ 7.00 | $ 15.00 | $ 16.00 | $ 17.00 |

Summerbrook Dental Group PLLC

| | Jan-21 | Feb-21 | Oct-21 | Nov-21 | Dec-21 | |
|---|---|---|---|---|---|---|
| **Other Expenses** | | | | | | |
| Interest Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| Owner's Expenses | | | | | | |
| Charitable Donations | | | | | | |
| Distributions | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | |
| Officer Disability Insurance | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | |
| Officer Health Insurance | 1,888.10 | 1,888.10 | 1,888.10 | 1,888.10 | 1,888.10 | |
| Officer Life Insurance | 4,003.00 | 4,004.00 | 4,012.00 | 4,013.00 | 4,014.00 | |
| **Total Owner's Expenses** | $ 26,241.10 | $ 26,242.10 | $ 26,250.10 | $ 26,251.10 | $ 26,252.10 | |
| **Total Other Expenses** | $ 26,241.10 | $ 26,242.10 | $ 26,250.10 | $ 26,251.10 | $ 26,252.10 | |
| **Class 2 - Independent Bank** | | | $ 1,877.00 | $ 1,877.00 | $ 1,877.00 | |
| **Class 3 - Byline** | | | $ 552.50 | $ 552.50 | $ 552.50 | |
| **Class 4 - US Bank** | | | $ 1,173.39 | $ 1,173.39 | $ 1,173.39 | |
| **Class 5 - FC Marketplace** | | | $ 1,564.52 | $ 1,564.52 | $ 1,564.52 | |
| **Class 7 - Unsecured Claims** | | | $ 3,400.00 | $ 3,400.00 | $ 3,800.00 | $ 31,000.00 |
| **Net Other Income** | -$ 26,235.10 | -$ 26,235.10 | -$ 34,802.51 | -$ 34,802.51 | -$ 35,202.51 | |
| **Net Income** | -$ 49,204.71 | -$ 16,705.71 | -$ 8,698.12 | -$ 8,799.12 | $ 7,799.88 | |
| **Ending Balance** | 39,030.36 | 22,324.65 | -38,413.31 | -47,212.43 | -39,412.55 | |

Exhibit C

Summerbrook Dental Group, PLLC
Exhibit C - No Avoidance Action

| General Assets | Liquidation Value | Cost of Sale/Collection | Total |
|---|---|---|---|
| Funds in Accounts (as of 8/31/20) | $78,850.84 | $ - | $78,850.84 |
| Accounts Receivable (as of 8/31/20) | $87,848 | $ 17,569.64 | $70,278.54 |
| Dental Supply Inventory | $4,000 | $ 400.00 | $3,600.00 |
| Disposable Inventory | $4,000 | $ 400.00 | $3,600.00 |
| Office Furniture | $6,000 | $ 600.00 | $5,400.00 |
| Website | 0 | $ - | $0.00 |
| Office Equipment, Software, and Computers | $400,000 | $ 40,000.00 | $360,000.00 |
| Customer Pre-Payments | $0 | | $0.00 |
| Total | $580,699.02 | $ 58,969.64 | $521,729.38 |
| | | Independent Bank Lien | $1,781,088.31 |
| | | Independent Bank Deficiency | ($1,259,358.93) |
| X-Guide | $ 30,000.00 | $ 3,000.00 | $ 27,000.00 |
| | | Byline lien | $31,000.00 |
| | | Byline Deficiency | ($4,000.00) |
| C/T Pano Machine | $104,000 | $10,400.0 | $93,600.00 |
| | | US Bank Lien | $245,529.96 |
| | | US Bank Deficiency | ($151,929.96) |
| Cryptocurrency Assets | | | |
| Troptions.gold Cryptocurrency[1] | $52,015.20 | $10,403.04 | $41,612.16 |
| Xtroptions.gold Cryptocurrency | $783,685.54 | $156,737.11 | $626,948.43 |
| Total | $2,131,098.78 | $167,140.15 | $668,560.59 |
| | | | |
| Funds for Distribution to the Estate | $668,560.59 | | |
| Chapter 7 Trustee Compensation | ($36,678.03) | | |
| Chapter 7 Professional Fees | ($30,000.00) | | |
| Chapter 11 Administrative Expenses | ($50,000.00) | | |
| Amount to Distribute to Unsecured Creditors | $551,882.56 | | |
| Percent Distribution to Unsecured Creditors | 23% | | |
| | | | |
| [1] Assumes a 30% cost of sale based on the assumed fees associated with converting the cryptocurrency to another form of cryptocurrency, then to Bitcoin, then to dollars | | | |

Summerbrook Dental Group, PLLC
Exhibit C - With Avoidance Action

| General Assets | Liquidation Value | Cost of Sale/Collection | Liens | Total |
|---|---|---|---|---|
| Funds in Accounts (as of 8/31/20) | $78,850.84 | $ - | | $78,850.84 |
| Accounts Receivable (as of 8/31/20) | $87,848 | $ 17,569.64 | | $70,278.54 |
| Dental Supply Inventory | $4,000 | $ 400.00 | | $3,600.00 |
| Disposable Inventory | $4,000 | $ 400.00 | | $3,600.00 |
| Office Furniture | $6,000 | $ 600.00 | | $5,400.00 |
| Website | 0 | $ - | | $0.00 |
| Office Equipment, Software, and Computers | $400,000 | $ 40,000.00 | | $360,000.00 |
| Customer Pre-Payments | $0 | | | $0.00 |
| X-Guide | $ 30,000.00 | $ 3,000.00 | $ 31,000.00 | $ - |
| C/T Pano Machine | $104,000 | $10,400.0 | $245,529.96 | $0.00 |
| **Cryptocurrency Assets** | | | | |
| Troptions.gold Cryptocurrency[1] | $52,015.20 | $10,403.04 | | $41,612.16 |
| Xtroptions.gold Cryptocurrency | $783,685.54 | $156,737.11 | | $626,948.43 |
| **Total** | **$1,550,399.76** | **$167,140.15** | | **$1,190,289.98** |

| | |
|---|---|
| Funds for Distribution to the Estate | $1,190,289.98 |
| Chapter 7 Trustee Compensation | ($36,678.03) |
| Chapter 7 Professional Fees | ($60,000.00) |
| Chapter 11 Administrative Expenses | ($50,000.00) |
| Amount to Distribute to Unsecured Creditors | $1,043,611.95 |
| Percent Distribution to Unsecured Creditors | 44% |

[1] Assumes a 30% cost of sale based on the assumed fees associated with converting the cryptocurrency to another form of cryptocurrency, then to Bitcoin, then to dollars

Exhibit D

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:                                    )
                                          )
JAMES T. CRAIG,                           )        Case No. 20-14530-JGR
                                          )        Chapter 11
                    Debtor.               )        Subchapter V
                                          )

---

## REPORT OF PETER KENT

---

**STATE OF COLORADO**          **)**
                               **) ss**
**COUNTY OF _____**   **)**

**EXHIBIT 1**

RESTRICTED – CONFIDENTIAL

# TABLE OF CONTENTS

I.      Education and Professional Background ...............................................................3
II.     Scope of Review .................................................................................................4
III.    A Quick Explanation of Cryptocurrency ..............................................................4
        A.      Addresses and Private Keys ....................................................................6
        B.      Cryptocurrency Wallets ...........................................................................7
IV.     Mr. Craig's Cryptocurrency Holdings .................................................................8
        A.      Wallets and Addresses Owned by Mr. Craig............................................9
        B.      Addresses Owned by Summerbrook Dental Group ...................................9
        C.      Wallets Holding Addresses in Dispute/Owned by Summerbrook Dental Group........10
        D.      Total Cryptocurrency Holdings ..............................................................11
V.      U.S. Dollar Valuations .....................................................................................12
        A.      Bitcoin .................................................................................................12
        B.      XTROPTIONS.GOLD and TROPTIONS.GOLD....................................13
                1.      CoinMarketCap ..........................................................................15
                2.      WorldCoinIndex .........................................................................16
                3.      CryptoCompare ..........................................................................16
                4.      Further Investigation ..................................................................16
                5.      Conclusion .................................................................................18
        C.      EGOLD ................................................................................................18
                1.      CoinMarketCap ..........................................................................18
                2.      WorldCoinIndex .........................................................................19
                3.      CryptoCompare ..........................................................................19
                4.      CoinGecko ..................................................................................19
                5.      SouthXchange .............................................................................20
                6.      YObit.net ....................................................................................22
                7.      Conclusion .................................................................................23
VI.     Liquidating the Cryptocurrency Assets ..............................................................23
VII.    Compensation ..................................................................................................24
Exhibit A: Snapshots from Mr. Craig's FreeWallet, Showing Blockchain Addresses ...................25

RESTRICTED – CONFIDENTIAL

## I.        Education and Professional Background

1.        I am a consultant, author, trainer, and expert witness in the area of Internet technology and digital marketing. I have been working with computer technology since early 1979, and have been involved in a wide range of capacities within the technology business, beginning with operating computer equipment used for oil-field drilling engineering and drilling optimization purposes; then, starting in 1981, working with software-development teams as a *Systems Analyst*, testing hardware and software systems, documenting said systems, designing user interfaces, training users, as well as installing, maintaining, and repairing systems. Since the mid-1980s, I have been involved in various additional functions in the technology business, including writing computer books, writing video-training scripts, creating Web sites, designing software, project managing software-development, developing online-marketing strategies, managing online-advertising and search-engine-optimization campaigns, and more.

2.        I began working online (using mechanisms such as CompuServe and bulletin-board systems) in 1984, and on the World Wide Web in 1993 (at a time when the Web only held 130 Web sites); I first began registering domains and building Web sites in 1994.

3.        I am currently a Principal at Peter Kent Consulting, LLC, which provides Internet-marketing and Internet-strategy consulting services to a varied client base. I have provided consulting services in this arena to Amazon, Zillow, Avvo, Tower Records, Lonely Planet, and literally hundreds of small and medium companies, from real-estate agents to travel retailers, lawyers to non-profits.

4.        In addition, I have written literally scores of books related to technology, primarily Internet technology. Starting in 1993 I wrote seven editions of the *Complete Idiot's Guide to the Internet*, have written seven editions of *SEO for Dummies*, as well as writing *Pay Per Click Search Engine Marketing for Dummies,* three books on JavaScript, a book on private-key encryption (the technology on which cryptocurrency is based), and so on. My most recent book is *Cryptocurrency Mining for Dummies*.

RESTRICTED – CONFIDENTIAL

5.      I have written and presented a number of online video-training courses, including courses on SEO and Amazon Marketplace for LinkedIn Learning, a course on SEO for Udemy (with over 30,000 students), and an 8-hour video course titled *Crypto Clear: Bitcoin and Cryptocurrency Made Simple*.

6.      I was also engaged by the *Catalyst Research Institute* advising congressional offices on issues related to cryptocurrency, and have worked as an expert witness in civil and criminal litigation, in cases related to patents, trademarks, online defamation, unfair business practices, copyright, online fraud, and so on; my testimony has been accepted by dozens of courts, state and federal, around the country, in cases in which the courts required assistance with understanding issues related to Internet technology and digital marketing.

## II.      Scope of Review

7.      I have been engaged in this matter by the law firm of Buechler Law Office, LLC, to review Mr. James T. Craig's cryptocurrency holdings and ascertain their value and how they may be liquidated for purposes of this bankruptcy.

8.      I have been provided with certain information, as described in this report, by Mr. Craig, including information regarding his possession of certain cryptocurrency "wallets" which control his cryptocurrency assets. Based on this information I have investigated the markets for these cryptocurrencies. By some measures Mr. Craig's cryptocurrency holdings seem to be worth over $75M, and thus I understand valuing these cryptocurrencies is an important issue. Unfortunately, as I explain in this report, in reality these cryptocurrencies are close to worthless.

## III.      A Quick Explanation of Cryptocurrency

9.      As most laypersons are not familiar with what cryptocurrency actually *is,* I felt it necessary to begin by providing a quick explanation.

RESTRICTED – CONFIDENTIAL

10.     A cryptocurrency is a store of value created through the use of complex mathematics and cryptography (in particular a form of cryptography called *public key encryption*), and dependent on the Internet. Without the Internet, cryptocurrencies cannot exist, because they depend on the Internet's distributed network of communication channels and computers to enable each cryptocurrency to function. Each cryptocurrency has a distributed network of computers that store information about the cryptocurrency transactions.

11.     Information about a cryptocurrency's "coins" and "tokens" is stored in a "blockchain," which is very secure, and distributed, type of database. Copies of the database are duplicated across numerous computer servers (known as "nodes") in numerous countries; for instance, the Bitcoin blockchain is duplicated across at least 11,000 nodes in around 110 different countries[1]. Furthermore, the structure of the database—in which "blocks" of data are "chained" together, using what are known as mathematical *hashes*—adds to the security; a blockchain managed by an active "community" of people running nodes is essentially unhackable, and thus transaction records within the blockchain can be trusted.

12.     In effect, the blockchain database is a *ledger*, a record of transactions, of cryptocurrency units being created, assigned to an address within the blockchain, and then being transferred to other addresses. Each address within the blockchain represents an "account" owned by person or corporation. (Each entity—individual or organization—can own multiple addresses.)

13.     Thus there is no *actual* cryptocurrency; there is no physical unit of currency, nor any digital representation of a "coin." Rather, the currency is merely represented by the record of transactions within the blockchain ledger. While this might seem strange, in fact most of the world's national currencies—US dollars, Pounds Sterling, Euros, and so on—are also merely records of transactions within electronic ledgers; there are far more "dollars" in the world than actual coins and dollar bills.

---

[1] See https://bitnodes.io/

RESTRICTED – CONFIDENTIAL

14.     Note also that it is very easy to create cryptocurrencies, and thus thousands—more than 7,500—have been created. Many were created as mere experiments by hackers, while others were created to enable financial scams. Consequently very few of these 7,500+ cryptocurrencies hold any value. There are perhaps around 1,200 different cryptocurrencies that each have a combined value over a million dollars (see https://coinmarketcap.com/12/); most of the other 6,300+ are currently valueless.

## A.     Addresses and Private Keys

15.     As explained, cryptocurrency is "stored" in the cryptocurrency's blockchain *ledger*, the currency's record of transactions. All cryptocurrency recorded in the ledger is associated with an *address*, in effect an identification code.

16.     For instance, the Summerbrook Dental Group's XTROPTIONS.GOLD cryptocurrency is associated with the address 1C7bnSsqYNNk4y9DHX3YAdFz8Z8APY5oYV; this is an actual entry in the Bitcoin blockchain "ledger." (TROPTIONS.GOLD is a form of currency known as a token, that can be stored in another cryptocurrency's blockchain.)

17.     The address and the currency associated with the address is public information; for example, anyone can go to https://xchain.io/address/, enter the address, and see the balance (see https://xchain.io/address/1C7bnSsqYNNk4y9DHX3YAdFz8Z8APY5oYV).

18.     The currency associated with the address is controlled through the use of a *private key*; a special numerical code, mathematically associated with the blockchain address that "owns" the currency. The owner of the money can send transaction messages to the blockchain in order to transfer the currency to another address, signing the message using the private key; thanks to highly complex mathematics associating the private-key-signed message with the address, only someone with knowledge of the private key is able to  send a valid message associated with that address.

19.     This means that only someone with knowledge of the private key can control the money associated with the address. Thus it is critical that the owner of cryptocurrency protects

RESTRICTED – CONFIDENTIAL

the private key in two ways. 1: The owner must ensure that he or she never loses the private key; loss of the key results in loss of access to the cryptocurrency. (The currency is still recorded in the blockchain, but without the private key the owner is unable to transfer—and thus use—the money.) 2: The owner must ensure that no other party gains control of the private key. Loss of the private key to another person risks theft of the currency.

## B.    Cryptocurrency Wallets

20.    Private keys are stored in what are known as cryptocurrency *wallets*. Despite the name, and widespread misunderstanding among even many cryptocurrency owners and investors, these wallets do not contain cryptocurrency; as explained earlier, the cryptocurrency is "stored" as a transaction record in the blockchain ledger.

21.    Instead, wallets store the private keys that provide access to the cryptocurrency in the blockchain, they do not store any kind of cryptocurrency or "coins" themselves.

22.    There are many types of wallets, but the common characteristic is that wallets store private keys. A software wallet is a program that stores private keys in an encrypted file on the computer on which the wallet software is running (and also allows the user to send messages to the blockchain transferring the currency); a hardware wallet is a non-computer hardware device of some kind that can store private keys, and connect to a computer when the owner needs to use the keys; a brain wallet refers to a person memorizing the private keys; a paper wallet is a piece of paper with private keys written down.

23.    Most wallets provide the user with access to the private keys. However, there is also a form of wallet that does *not* provide such access. A *custodial* wallet is a wallet managed by a third party that, in effect, sits between the owner and their cryptocurrency stored within the blockchain; the private key that controls the address to which the owner's currency is assigned is hidden from the owner. All transactions are requested by the owner, and carried out by the service managing the custodial wallet. Mr. Craig has several *non-custodial* wallets that he manages directly himself, but also has one custodial wallet, held by a service called YObit.

RESTRICTED – CONFIDENTIAL

## IV.      Mr. Craig's Cryptocurrency Holdings

24.      I have been informed by Mr. Craig that he and Summerbrook Dental Group have three "groups" of wallets:

- Wallets managing cryptocurrency owned by Mr. Craig.
- Wallets managing cryptocurrency owned by Summerbrook Dental Group.
- Wallets managing cryptocurrency originally owned by Summerbrook Dental Group but transferred to certain debtors (the debtors refused to accept them as payment). Mr. Craig regards these wallets as "in dispute."

25.      I have listed the wallets (and where available the associated addresses) in these three groupings, below. Note that most of the addresses are not assigned any value; they control no cryptocurrency. That is perfectly natural, as wallets often create multiple addresses and not all of them are ever used.

26.      These various wallets are stored in several locations:

- **Counterwallet1 through Counterwallet6**[2]: Six separate Web-based wallet accounts, with separate login passwords, stored at https://wallet.counterwallet.io/.
- **FreeWallet**: Mr. Craig has a FreeWallet app on his smartphone. It is open-source wallet software from www.FreeWallet.io. It manages the first five addresses that are also controlled by the Counterwallet1 wallet, and another five addresses with no cryptocurrency assigned (see Exhibit A for screenshots showing the addresses managed by this wallet).
- **YObit.net:** YObit is a well-known cryptocurrency exchange, and Mr. Craig has EGOLD stored in a wallet managed by YObit. However, this is a "custodial" wallet; in effect the wallet and the associated private key is held by YObit, and the owner has to trust YObit to act ethically and legally (to, for instance, transfer the cryptocurrency to another address on request of the owner).

27.      Below, I have listed the different wallets and (for the non-custodial wallets), blockchain addresses managed by the wallets. Where there are balances associated with the addresses, I have bolded the text. The URLs are links to a "blockchain explorer" which provides information about the addresses and their balances.

---

[2] The six Counterwallets have no user ID or other identifier. Rather, the six different passwords (or passphrases) both identify the wallets and provide security for the wallets. Thus I have simply created names for the six wallets, Counterwallet1 through Counterwallet6, as it would not be secure to provide the passphrases in this document.

RESTRICTED – CONFIDENTIAL

### A.    Wallets and Addresses Owned by Mr. Craig

**Wallet: Counterwallet7**
Address: 1EpgSYRmEp2KWqjuWZ8smwGeGVSpsm4Y4Y
**XTROPTIONS.GOLD: 854,564 units**
https://xchain.io/address/1EpgSYRmEp2KWqjuWZ8smwGeGVSpsm4Y4Y

bc1qlxxmdxj2ld4lqkmcak69m6glh2xn56kp9jhr7w
NO ASSIGNED VALUE
https://xchain.io/address/bc1qlxxmdxj2ld4lqkmcak69m6glh2xn56kp9jhr7w

**Wallet: Yobit.net** (a custodial wallet, and thus no published address)
**EGOLD: 7,644,000,000.0 units**
Because this is a custodial wallet, there is no published address for the
cryptocurrency managed by the wallet. The image below is a screenshot from Mr.
Craig's Yobit.net account showing the balance.



### B.    Addresses Owned by Summerbrook Dental Group

**Wallet: Counterwallet1 & FreeWallet Software on Mr. Craig's Smartphone[3]**
1C7bnSsqYNNk4y9DHX3YadFz8Z8APY5oYV
    **Bitcoin: 0.00565939BTC**
    **XTROPTIONS.GOLD: 39,198.55592143 units**
    **TROPTIONS.GOLD: 130 units**
https://xchain.io/address/1C7bnSsqYNNk4y9DHX3YAdFz8Z8APY5oYV

1Cug93gRsk5TlaJmhs6XzBBMu3zEvW5mdV
    NO ASSIGNED VALUE

---

[3] Private keys can be stored in multiple wallets; in this case the private keys controlling the first five addresses in
Counterwallet1 wallet are also stored in the FreeWallet wallet on Mr. Craig's phone. The FreeWallet also has other
addresses—see Exhibit A—but the additional address do not have any associated cryptocurrency.

RESTRICTED – CONFIDENTIAL

https://xchain.io/address/1CUg93gRsk5TLaJmhs6XzBBMu3zEvW5mdV

16dcEBWGUxbvUGpp9dLosmfTcxFkohecwC
  NO ASSIGNED VALUE
https://xchain.io/address/16dcEBWGUxbvUGpp9dLosmfTcxFkohecwC

1Gfv9dNcuGM2V86eKYCUF5WEZ68bzA9ou
  NO ASSIGNED VALUE
https://xchain.io/address/1Gfv9dNcuGM2V86eKYCUF5WEZ68bzA9ou

1JRVrrha9EsmfHnWzZEbE4stQCXDt5mcJo
  NO ASSIGNED VALUE
https://xchain.io/address/1JRVrrha9EsmfHnWzZEbE4stQCXDt5mcJo

bc1qhtuen0faga08639zvjckjaqlq9xaq29kvemjgs – Counterwallet1
  NO ASSIGNED VALUE
https://xchain.io/address/bc1qhtuen0faga08639zvjckjaqlq9xaq29kvemjgs

## C. Wallets Holding Addresses in Dispute/Owned by Summerbrook Dental Group

### Wallet: Counterwallet2
1JovDKScbQ1Efj6ZrK1NdBXvar5JyAk2dX
  **XTROPTIONS.GOLD: 54,101.34867962 units**
https://xchain.io/address/1JovDKScbQ1Efj6ZrK1NdBXvar5JyAk2dX

bc1qe3ps0vycs98ducq9602zxqpecv5p4lvtxv85dc
  NO ASSIGNED VALUE
https://xchain.io/address/bc1qe3ps0vycs98ducq9602zxqpecv5p4lvtxv85dc

### Wallet: Counterwallet3
16iR47zgPJf4fa1ntMJCULsGrypJS9QJm6
  **XTROPTIONS.GOLD: 16,240.09544448 units**
https://xchain.io/address/16iR47zgPJf4fa1ntMJCULsGrypJS9QJm6

bc1qq48h94jgvy6tz8fdhmsc9vfmf3z9jc6xxzurl5
  NO ASSIGNED VALUE
https://xchain.io/address/16iR47zgPJf4fa1ntMJCULsGrypJS9QJm6

### Wallet: Counterwallet4
17MN9tYaBiUNoJ2U6qddUzm1s1vFSjVn1P
  **XTROPTIONS.GOLD: 26,436.09113640 units**
https://xchain.io/address/17MN9tYaBiUNoJ2U6qddUzm1s1vFSjVn1P

bc1qptgqaks42aw0fmn0mu5crnsdpamfyxfaamlcp4
  NO ASSIGNED VALUE

RESTRICTED – CONFIDENTIAL

https://xchain.io/address/bc1qptgqaks42aw0fmn0mu5crnsdpamfyxfaamlcp4

1NfAtGNd1wz7AmxSd1kWsCGnWJizM9ajLj
    NO ASSIGNED VALUE
https://xchain.io/address/1NfAtGNd1wz7AmxSd1kWsCGnWJizM9ajLj

bc1qg24kq99yypu9hhlkv7l3r50ml003v8tz6xtxg5
    NO ASSIGNED VALUE
https://xchain.io/address/bc1qg24kq99yypu9hhlkv7l3r50ml003v8tz6xtxg5

**Wallet: Counterwallet5**
12R2SssMa9gjN6hS1472AET5etsGqARGpx
    **XTROPTIONS.GOLD: 9,731.80155714 units**
https://xchain.io/address/12R2SssMa9gjN6hS1472AET5etsGqARGpx

bc1qdrjcz7jdf5vzdec339lltales8rlepd3n92vyt
    NO ASSIGNED VALUE
https://xchain.io/address/bc1qdrjcz7jdf5vzdec339lltales8rlepd3n92vyt

**Wallet: Counterwallet6**
1FT9HmbS9LxMKfW3uFHN6igbD5XkkWehJW
    **XTROPTIONS.GOLD: 24,331.26727174 units**
https://xchain.io/address/1FT9HmbS9LxMKfW3uFHN6igbD5XKkWehJW

bc1qhacucr4csmr7l6dlnjs7x674q0zmjt22w4psva
    NO ASSIGNED VALUE
https://xchain.io/address/bc1qhacucr4csmr7l6dlnjs7x674q0zmjt22w4psva

### D.    **Total Cryptocurrency Holdings**

28.    Thus Mr. Craig has four different cryptocurrencies. The following table shows the total cryptocurrency holdings managed by these various wallets. Note that cryptocurrency, as can be seen in this table, can be bought and sold in *fractions*; there is no need to purchase complete units. Thus, for instance, Summerbrook owns six one thousandths of a Bitcoin.

| Owner | Bitcoin | XTROPTIONS. GOLD | TROPTIONS. GOLD | EGOLD |
|---|---|---|---|---|
| Mr. Craig | | 854,564 | | 7,644,000,000.0 |
| Summerbrook | 0.0056593939 | 39,198.55592143 | 130 | |
| Disputed | | 130,840.60408938 | | |
| **Totals:** | **0.0056593939** | **1,024,603.16001081** | **130** | **7,644,000,000.0** |

RESTRICTED – CONFIDENTIAL

## V. U.S. Dollar Valuations

29.  Having determined the value of Mr. Craig's various holdings in their native cryptocurrencies, I next attempted to determine the value in a more commonly accepted medium of exchange, U.S. dollars. While the numbers above look very large, in fact the total value in terms of U.S. dollars is, as I will show, negligible. (Ironically the smallest number—0.0056593939—is worth far more than the larger numbers.) Below I have explained, for each currency, how I determined the value and what that value is.

30.  Cryptocurrencies can be sold through numerous different markets, and in private transactions between two parties. Thus value can vary a little depending on how and where the currency is sold. Note also that cryptocurrencies are very volatile. The pricing stated in this report was correct as of October 27, 2020, in the markets noted below. However, the price could change, up or down, and the only real way to know what a cryptocurrency is worth is to sell it.

31.  Note also that there are literally thousands of different cryptocurrencies, 7,500 or more, most of which have little or no value and many of which were created as a way to scam investors.

### A. Bitcoin

32.  Of the four currencies at issue in this report, Bitcoin is the easiest to deal with. There is a large and active market for this cryptocurrency, and in recent months the value has been relatively stable, with a significant increase in recent days (thanks to an announcement by PayPal that it was going to begin working with cryptocurrencies).

33.  As noted above, Summerbrook owns 0.0056593939BTC. I checked the USD value using Google, which gets its data from Coinbase (the largest and most reputable U.S. cryptocurrency exchange). I simply searched for *0.0056593939btc in usd*; as shown below, the value was, on October 27, 2020, $77.25.

RESTRICTED – CONFIDENTIAL



34.     The current value can be checked using this link:

https://www.google.com/search?q=0.0056593939btc+in+usd

35.     Note that Bitcoin is the most significant of all cryptocurrencies, and overall the most valuable; as of October 27, 2020 the "market capitalization" of Bitcoin is $252,641,969,540USD (that is, there are 18,527,956 Bitcoin in circulation, and the price is currently $13,635.72 per coin).[4]

36.     Over the last 24 hours around 2.3M Bitcoin have "changed hands," with a total trading volume for those 24 hours of $31,814,563,758USD. Thus Bitcoin is valuable and there is a market for it. Mr. Craig can quickly and easily convert the Bitcoin into USD.

**B.     XTROPTIONS.GOLD and TROPTIONS.GOLD**

37.     XTROPTIONS.GOLD and TROPTIONS.GOLD are *Counterparty* tokens. Counterparty (https://counterparty.io/) provides a quick and easy way to create tokens[5] that are stored within the Bitcoin blockchain.

---

[4] https://coinmarketcap.com/currencies/bitcoin/
[5] A *coin* is generally regarded as a cryptocurrency that has its own blockchain; bitcoin is a coin, and bitcoin transactions are stored in the bitcoin blockchain. A *token* is generally regarded as form of cryptocurrency that is stored within a blockchain originally created for a coin; TROPTIONS.GOLD and XTROPTIONS.GOLD are tokens stored within the bitcoin blockchain.

RESTRICTED – CONFIDENTIAL

38.     The term TROPTIONS is a contraction of *Trade Options*, and TROPTIONS were in theory created to be used in "the barter or trade exchange industry."[6] That is, the currencies were supposed to be used to buy products within barter communities; Mr. Bryan Stone, one of the principal promoters of the currency, explained to me that TROPTIONS provide a way for people to buy high-value commodities, such as cars and houses, at a fraction of their real price.

39.     It's unclear how such a mechanism can work, of course, and the organization managing the cryptocurrency seems to use high-pressure, person-to-person sales techniques to convince individuals of the value of the currency. The Office of the Secretary of State for Missouri accused the TROPTIONS CORPORATION of making "numerous statements that are materially misleading or otherwise likely to deceive the public," such as "Troptions the coin of Kings and Queens where billionaires and millionaires are being created daily."[7]

40.     According to the CoinDaddy Web site, which provides access to the Counterparty transactions in the Bitcoin blockchain, XTROPTIONS.GOLD are currently worth $4.09 each[8] (and thus Mr. Craig's tokens are worth $4,190,626.92), and TROPTIONS.GOLD are currently worth $293.31 each[9] (and thus Mr. Craig's TROPTIONS.GOLD tokens are worth $38,130.30).

41.     As noted above, I spoke to one of the promoters of TROPTIONS, Mr. Bryan Stone, and he told me that those prices reflect the actual value of the cryptocurrency. However, unless it's possible to find someone to actually pay at these rates it's *not* the value, and it's unclear whether it *is* possible to find someone to buy this cryptocurrency. As I discuss later, Mr. Stone was unable to explain to me where I might find such a market.

42.     Both these currencies—TROPTIONS.GOLD and XTROPTIONS.GOLD—were originally created by the same organization, have been widely criticized, and seem to have run into regulatory problems. For example, as I noted earlier, the Missouri Securities Commission took action against the people running TROPTIONS:

---

[6] See https://medium.com/@bryanstone_78278/a-brief-history-of-troptions-475a37c20b43
[7] https://www.sos.mo.gov/CMSImages/Securities/AP-19-02AO.pdf
[8] https://xchain.io/asset/XTROPTIONS.GOLD
[9] https://xchain.io/asset/TROPTIONS.GOLD

RESTRICTED – CONFIDENTIAL

"Troptions Corporation and Harris, based out of West Palm Beach, Florida, operate a business offering a cryptocurrency called "Troptions" to investors in exchange for cash or bitcoin. The division alleges they are offering or selling an unregistered security and making false and misleading statements in the sale of the security."

https://www.sos.mo.gov/it/custom/securitiesnews.aspx?PageId=9569

43.     In addition, the SEC seems to have "suspended trading" of TROPTIONS at one point.[10] It is also possible to find comments in cryptocurrency forums suggesting that these cryptocurrencies were a scam. See, for instance:

https://reputation.coindaddy.io/xcp/asset/XTROPTIONS.GOLD

44.     Regardless of the original purpose of the cryptocurrencies, and Mr. Stone's claims, it seems to be defunct…valueless. I began my assessment by visiting the cryptocurrency's Web site, provided to me by Mr. Craig: https://troptionsxchange.com/. This site does not seem to have been updated in a long time; it has a copyright date of 2019 in the footer, and the most recent press release is from April 2019, referring to the legal action being taken by the Missouri Securities Commission.[11]

45.     There is also http://www.troptionsmarketplace.com/, an associated site set up to help TROPTIONS owners make purchases using their cryptocurrency. The most recent "featured listings" are from November, 2017, and the most recent "hottest listing" is from December, 2017 (http://www.troptionsmarketplace.com/index.php).

46.     I attempted to check the prices of these cryptocurrencies at three well-known pricing search engines: CoinMarketCap (https://coinmarketcap.com/), WorldCoinIndex (https://www.worldcoinindex.com/), and CryptoCompare (https://www.cryptocompare.com/).

### 1.     CoinMarketCap

47.     When searching CoinMarketCap for the terms *xtroptions* or *trpotions*, the system does not return any information. However, by searching the site through Google

---

[10] https://icoexaminer.com/ico-news/sec-issues-warnings-ico-schemes-following-suspension-4-firms/
[11] https://troptionsxchange.com/2019/04/15/communication-from-counsel-press-release/.

RESTRICTED – CONFIDENTIAL

(*site:coinmarketcap.com troptions*), I was able to find an old page on the site:

https://coinmarketcap.com/currencies/troptions/ (I was unable to find an *xtroptions* page).

48.     This page shows that CoinMarketCap did in fact track the value of TROPTIONS, but only up to August 18, 2017. It currently lists the cryptocurrency as *Inactive*. The page does show a USD value for the cryptocurrency—$0.239546 per coin—but that is simply the value for the last trade that CoinMarketCap recorded, more than three years ago.

### 2.     WorldCoinIndex

49.     This well-known pricing site does not appear to contain any information about these cryptocurrencies.

### 3.     CryptoCompare

50.     CryptoCompare was able to find XTROPTIONS (https://www.cryptocompare.com/coins/xtroptions/overview), though not TROPTIONS. However, the site shows the following message, and provides no data about the value of the cryptocurrency:



It's not yet trading on any of the exchanges we have integrated with.

### 4.     Further Investigation

51.     Mr. Craig suggested that I called Mr. Bryan Stone, who is on the Board of Directors of Strategic Global Investments, the company that seems to manage TROPTIONS[12]. I did so, and Mr. Stone told me that TROPTIONS definitely still have value and can be sold or traded, but he was unable to explain how or where. He stated that the Web site at

---

[12] https://www.globenewswire.com/news-release/2017/08/21/1090747/0/en/Strategic-Global-Investments-Inc-Announces-the-Dynamic-Addition-of-Bryan-Stone-to-the-Board-of-Directors.html; the president of this company is Garland Harris, the founder of TROPTIONS; see also https://www.globenewswire.com/news-release/2017/08/21/1090747/0/en/Strategic-Global-Investments-Inc-Announces-the-Dynamic-Addition-of-Bryan-Stone-to-the-Board-of-Directors.html

RESTRICTED – CONFIDENTIAL

https://troptionsxchange.com/ has current activity related to trading, but this does not appear to be correct (as noted earlier).

52.     Mr. Stone also said that there were Facebook pages in which people traded TROPTIONS. I checked the following Facebook accounts, and found little activity that wasn't being generated by the promoters themselves:

- https://www.facebook.com/TROPTIONSXCHANGE/

   1,261 followers; the top ("pinned") post is a repost from someone who supposedly purchased a car using TROPTIONS in December, 2018. I went back to April of this year and saw no posts that weren't posted by the promoters, and very few people posting comments or "liking" posts. Five days ago someone did post this: "Where do you find people who want to barter with Troptions.gold? My friend has over 100,000 of them and can't do anything with them." In response the promoter said "if you cant (sic) explain them you will never be able to use them. Learn how to explain them and then you'll be able to use them. People are using Troptions every day."

- https://www.facebook.com/Troptionsmarketplace/

   228 followers, most recent post October 14; I went back to October of 2019 and found no messages posted by anyone other than the promoters

- https://www.facebook.com/TroptionsTrading/

   425 followers, most recent post September 29; I went back to March of 2020 and found no messages posted by anyone other than the promoters

- https://www.facebook.com/XTROPTIONS.AUS/

   206 followers; the most recent post is from May 19, the one before that (on March 11) proclaims "TROPTIONS are alive and well!" Only 5 posts since September 18, 2019, and none by anyone but the promoters.

RESTRICTED – CONFIDENTIAL

- https://www.facebook.com/groups/Troptions/

  A Facebook group with 568 members, but only 2 posts (from the promoters) since October 2019

53.    The currency also has an official Twitter account at https://twitter.com/troptions2017, which has just 142 followers, with the most recent post on August 26.

### 5.    Conclusion

54.    There does not seem to be an active community of investors associated with these cryptocurrencies, and I have not been able to find a viable market for either one, and thus they appear to be valueless.

## C.    EGOLD

55.    EGOLD is also a token cryptocurrency; this time the tokens are ERC20 tokens that are stored in the Ethereum blockchain. (Ether, the "native" cryptocurrency on this blockchain, is the world's second most valuable cryptocurrency after Bitcoin).

56.    The currency's original Web site was at https://egoldtoken.org/, but there is currently no functioning Web site at this URL and, according to Archive.org's WayBackMachine, in May of 2020 this domain name was for sale (https://web.archive.org/web/20200513033005/https://egoldtoken.org/). The last time the WayBackMachine took a snapshot of a functioning Web site running on this domainname was in September of 2018, five months after CoinMarketCap's last recorded EGOLD transaction (https://web.archive.org/web/20180903080919/https://egoldtoken.org/).

### 1.    CoinMarketCap

57.    As with the TROPTIONS cryptocurrencies, CoinMarketCap does not respond with search results when searching for *egold*. However, I was again able to find a page through Google (by searching for *site:coinmarketcap.com egold*).

RESTRICTED – CONFIDENTIAL

58.     The page at https://coinmarketcap.com/currencies/egold/ shows a value of $0.009425USD—just under a penny—per token. Based on this number Mr. Craig's EGOLD holdings would be worth over $72M (7,644,000,000 x 0.009425). However, as with the prior cryptocurrencies this is simply the value at the last trade, which is recorded as being on April 3, 2018. The page also lists this cryptocurrency as *Inactive*.

### 2.   WorldCoinIndex

59.     WorldCoinIndex does still have an EGOLD page, at https://www.worldcoinindex.com/coin/egold, and records its "last price" as being $0.002326USD. Based on this number Mr. Craig's EGOLD holdings would be worth $17,779,944 (7,644,000,000 x 0.002326). However, WorldCoinIndex also shows no trading volume for this cryptocurrency.

60.     The price seems to be the calculated average price from two markets that supposedly trade EGOLD: ForkDelta (https://forkdelta.app/#!/trade/DAI-ETH) and SouthXchange (https://main.southxchange.com/). However, I could find no evidence that ForkDelta is currently working with EGOLD (it appears that ForkDelta used to work with EGOLD, perhaps recently, but no longer does). I was able to find some activity on SouthXchange, though, which I will discuss in a moment, and it appears that the WorldCoinIndex value is coming from SouthXchange.

### 3.   CryptoCompare

61.     I was unable to find any information regarding EGOLD in CryptoCompare.

### 4.   CoinGecko

62.     I also found information on EGOLD on another pricing site, CoinGecko.com (https://www.coingecko.com/en/coins/egold). CoinGecko shows the price of EGOLD to be $0USD, but does show some "trading" going on, in small volumes; $42.87USD's worth on October 23, for instance. CoinGecko's data suggests that there is no viable market for EGOLD.

RESTRICTED – CONFIDENTIAL

63.     The CoinGecko page also links to the currency's Twitter account (https://twitter.com/eGoldToken—the most recent Tweet is from January 9, 2018); to the currency's Github account (https://github.com/e-goldcoin—Github stores open-source software and is frequently used by open-source cryptocurrencies…there has been no activity in this account since 2015); and to the currency's Bitcoin Talk forum (https://bitcointalk.org/index.php?topic=2253578.0—the most recent post is from December, 2019, from someone trying to track down a market for EGOLD, and prior to that the most recent post was April, 2018).

64.     I also found a link to the currency's Medium account (https://medium.com/@eGoldToken; Medium is a very popular "blog" platform among technology companies), but there have been no posts there since January 2018.

### 5.     SouthXchange

65.     SouthXchange (https://main.southxchange.com/) is a marketplace that does seem to be working with EGOLD. The chart below shows trading occurring over the last year:



RESTRICTED – CONFIDENTIAL

66.     Each vertical bar represents trading during the week; where no bars are present, there was no trading (red bars are price drops, green bars are price increases). The vertical bars at the bottom show the volume traded in a week, during the previous twelve months. In some cases the trading volume is so low, though, that no volume bar can be shown. However, by pointing at the "floating" trading bars, one can find the trading volume. In the image above I pointed at the fourth trading bar from the left, and the volume line (just below the EGOLD/BTC line) shows a volume of 99; that is, 99EGOLD being traded.

67.     The total trading volume over this one year period was just over 718,054 units of EGOLD being sold. On many weeks there were no trades at all, and some trades were as low as 0.2EGOLD; the highest was just 98,759EGOLD.

68.     At the highest recorded EGOLD price during the year (0.000000210BTC, or $0.0027USD), the entire traded value, for the entire year, would have been $267.65USD (98,759EGOLD x $0.0027USD). At the lowest recorded value (0.000000010BTC, or $0.00013USD), the entire traded value would have been just $12.84 (98,759EGOLD x $0.00013USD).

69.     This is clearly not a healthy market. The trading that is occurring is perhaps being carried out by a small number of individuals just trying to keep the market alive, hoping that something may revive it. That's highly unlikely.

70.     Mr. Craig's holdings of EGOLD are 7,644,000,000 units. That is, Mr. Craig owns around 10,645 times the total amount traded over the last 12 months. At the lowest recorded price over the year, Mr. Craig's EGOLD would be worth $993,720; at the highest price, almost $21M. However, there is no possible way to extract this sum; Mr. Craig has a volume that is the equivalent of almost 11,000 years of trading at SouthXchange. There is no way he could simply sell it.

RESTRICTED – CONFIDENTIAL

### 6.    YObit.net

71.    There is also, of course, YObit.net, which is where Mr. Craig's EGOLD is held. See, for instance, https://yobit.net/en/trade/EGOLD/USD (showing pricing of EGOLD in USD) and https://yobit.net/en/trade/EGOLD/BTC (showing the price in Bitcoin).

72.    However, when I checked there were no open "Buy" orders for purchasing EGOLD with USD or Bitcoin, though there were "Sell" orders; in other words, while there are people wanting to sell the currency, nobody was offering to buy.

73.    One recent Sell order offered 121,554,807,952.47586132 EGOLD for $1,215.55. At this valuation Mr. Craig's EGOLD would be worth around $76 ((1,215.55/121,554,807,952.47586132)*7,644,000,000). The most recent day of transactions recorded saw, on October 14, 2020, 1,693,069,045.80838346 EGOLD being traded for $16.93USD; that is essentially $0.00000001USD for each EGOLD unit, putting a value of, again, $76 on Mr. Craig's 7,644,000,000 units ((16.93/1,693,069,045.80838346)*7,644,000,000).

74.    It may also be possible to sell EGOLD in exchange with other cryptocurrencies, such as Dogecoin (DOGE; see https://yobit.net/en/trade/EGOLD/DOGE), but there is no reason that its value should be significantly different. One order here was 11,494,252.873563219DOGE. That's 11,494,252.873563219EGOLD per DOGE, or 665.028 DOGE for all Mr. Craig's EGOLD. DOGE is currently valued at CoinMarketCap.com at $0.002654 per unit (https://coinmarketcap.com/currencies/dogecoin/; there is a viable DOGE market), so 665.028DOGE is $1.76.

75.    Finally, I also checked five very highly rated exchanges (there are hundreds): CEX.io, CoinMama.com, LocalBitcoins.com, Binance.com, Coinbase.com. These have been suggested by 99Bitcoins.com, a popular and respected cryptocurrency information site, as some of the world's top exchanges[13]. None of these exchanges work with EGOLD.

---

[13] See https://99bitcoins.com/bitcoin-exchanges/ and https://www.youtube.com/watch?v=PXSjbdOXgUE

RESTRICTED – CONFIDENTIAL

76.     Thus only places I could find that have "active" exchanges working with EGOLD were SouthXchange and YObit.net, and even these exchanges do not have particularly viable markets for EGOLD.

### 7.    Conclusion

77.     The EGOLD cryptocurrency also appears to be defunct, and likely valueless, or close to no value. I have been unable to find a viable market for this currency.

## VI.     Liquidating the Cryptocurrency Assets

78.     The following is a summary of my conclusions:

- Based on information provided to me by Mr. Craig, Mr. Craig and Summerbrook Dental Group own the following cryptocurrencies:
  - o  Bitcoin: 0.0056593939
  - o  TROPTIONS.GOLD: 1,024,603.16001081
  - o  XTROPTIONS.GOLD: 130
  - o  EGOLD: 7,644,000,000
- The Bitcoin is easily converted to USD, and is worth around $75. Mr. Craig could liquidate this very quickly—within minutes—as there is a very active market in Bitcoin.
- The TROPTIONS.GOLD and XTROPTIONS.GOLD are most likely completely valueless; I am aware of no legal or legitimate mechanism through which these cryptocurrencies can be converted to USD, and even the currency's promoter, Mr. Bryan Stone, was unable to suggest to me how it might be sold (beyond stating "ask the guy he bought it from if he'll buy it back" and "buy a house or car with it and then sell that").
- The EGOLD has minimal value, because there is no large, active market for the cryptocurrency. While Mr. Craig might be able to sell small amounts of the currency—a few dollars' worth now and then—there appears to be no way to sell all of the holdings.

79.     These cryptocurrencies' earlier valuations, and even current valuations based on tiny transactions, do not mean anything if it is not possible to sell the currencies. A unit of EGOLD was once, for perhaps just a few minutes, worth 18.8 cents[14]; at that point Mr. Craig's

---

[14] https://coinmarketcap.com/currencies/egold/

RESTRICTED – CONFIDENTIAL

holdings had a theoretical value of almost one and a half billion dollars. But that was a totally speculative "bubble" value, and today the currency has no value. (And in any case, it would not have been possible to unload his total holdings; only around $7,500 worth of EGOLD sold at 18.8 cents.)

80.     Mr. Craig can easily liquidate the Bitcoin, but as for the other currencies there does not seem much hope of converting them to anything of value. There does not seem to be any kind of TROPTIONS marketplace, and thus Mr. Craig likely has no option but to hold the currencies. As for the EGOLD, most likely the best Mr. Craig could do is to sell ten dollars' worth of it now and then, which would be more trouble than it's worth. I would recommend holding the EGOLD to see if the price ever recovers; however, it is most unlikely that this will ever occur.

## VII.    Compensation

81.     I am providing this Report on an hourly basis at my normal hourly rate of $550.00.

Dated this 30th day of October 2020          _____
                                             Peter Kent
                                             399 East Bayaud Avenue
                                             Denver Colorado 80209
                                             720-771-3246
                                             Peter@PeterKentConsulting.com

RESTRICTED – CONFIDENTIAL

# Exhibit A: Snapshots from Mr. Craig's FreeWallet, Showing Blockchain Addresses



Exhibit E

## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| Summerbrook Dental Group, PLLC | ) | Case No. 20-11168-JGR |
| | ) | Chapter 7 |
| *Debtor.* | ) | |

## REPORT OF INVESTIGATIONS

Joli A. Lofstedt, the Subchapter V Chapter 11 Trustee ("*Sub V Trustee*"), hereby submits this Report of Investigations pursuant to the Court's Order Granting United States Trustee's Motion for Investigation by Subchapter V Trustee [Dkt. No. 91]. In support hereof, the Sub V Trustee states as follows:

### I.    BACKGROUND

1.    On February 21, 2020 (the "*Petition Date*"), Summerbrook Dental Group, PLLC ("*Summerbrook Dental*") filed a Voluntary Petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code in the United States Bankruptcy Court for the District of Colorado, Case No. 20-11168-JGR (the ("*Summerbrook Dental Bk. Case*"). Summerbrook Dental remains a Debtor - in-Possession.

2.    Trustee was appointed the Subchapter V Trustee on February 24, 2010.

3.    Summerbrook Dental is a Colorado professional limited liability company that owns and operates a dental practice in Aurora, Colorado.

4.    On Schedule A/B – Real and Personal Property filed with the Voluntary Petition [Dkt. No. 1], Summerbrook Dental listed, among other assets, ownership in the following cryptocurrency (collectively, the "*Cryptocurrency*"):

    a.    Troptions.gold cryptocurrency – 130.00000000 units; as of date of filing valued at $449.33/unit

    b.    Xtroptions.gold cryptocurrency – 129,534.80042143 units; as of date of filing valued at $6.87/each

5.    In response to Question 3 on the Statement of Financial Affairs filed with the Voluntary Petition [Dkt. No. 1], which required Summerbrook Dental to list payments or transfers, including expense reimbursements, to any creditor, other than regular employee compensation, within 90 days before filing the bankruptcy case unless the aggregate value of all property transferred to that creditor is less than $6,825, Summerbrook Dental listed, among other transfers, the following transfers in cryptocurrency:

a. Blue Vine – In November 2019 transferred $12,865.93; Paid in full in cryptocurrency – total amount of value transferred $137,685.33

b. Headway Capital – In October 2019 - $3,283.98; Paid in full in cryptocurrency $50,000 – total amount of value transferred $53,283.98.

c. LG Funding – In October 2019 - $13,600; November of 2019 - $13,600; Paid in cryptocurrency $70,750 – Total amount of value transferred $97,950.

d. National Funding (*NFAS, LLC*) – In October 2019 - $5,920; November of 2019 - $7,770; December 2019 - $11,637.84; Paid in cryptocurrency 40672.16 – Total amount of value transferred $66,000.

e. On Deck Capital – In October 2019 - $10,692.30; November 2019 – $14,256.40; Paid in cryptocurrency $170,051 – Total amount of value transferred $194,999.70.

6.    Dr. James T. Craig is the 100% owner of Summerbrook Dental.  On Summerbrook Dental's Statement of Financial Affairs, Summerbrook Dental listed the following payments/compensation to Dr. Craig:

a. Question 4.2 – 2019 Payments to Third Party Insurance Companies for the benefit of Dr. Craig:

   i.    Disability Insurance:  $7,414.38

   ii.   Health Insurance:  $22,657.20

   iii.  Life Insurance:  $87,519.20

b. Question 30.1 – Shareholder loan in December of 2019 to Dr. Craig in the amount of $145,000; Repaid in February of 2020.

c. Question 30.2 - $10,000 in 2019 – officer wages

d. Question 30.3 - $425,685 – periodically through 2019 – Distributions to Dr. Craig

7.    On March 17, 2020, the United States Trustee ("*UST*") conducted the meeting of creditors in the Summerbrook Dental bankruptcy case as required by 11 U.S.C. §341 (the "*341 Meeting*").

8.    Following the 341 Meeting, the UST filed a Motion for Investigation by Subchapter V Trustee seeking Court authority pursuant to 11 U.S.C §1183(b)(2) for the Sub V Trustee to conduct further investigations into certain matters (the "*Investigation Motion*").  [See Dkt. No. 85].  On June 25, 2020, the Court entered an Order granting the Investigation Motion and authorizing the Sub V Trustee to conduct investigations relating to the following matters (the "*Investigation Order*") [Dkt. No. 91]:

2

a. The value of the cryptocurrency owned by Summerbrook Dental on the Petition Date;

b. Whether Summerbrook Dental effectively repaid any of its debts using cryptocurrency (and if not, what interest Summerbrook Dental still has in the cryptocurrency it claims to have paid to creditors); and

c. The value Dr. Craig received in exchange for transferring cryptocurrency to Summerbrook Dental and whether the estate holds any claims against Dr. Craig based on those transfers.

9.      The Investigation Order further provided that if the Sub V Trustee uncover facts during the course of investigations including "fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Summerbrook Dental, or to a cause of action available to the estate", the report should disclose those issues.

## II.      VALUE OF CRYPTOCURRENCY

10.     On July 1, 2020, Dr. Craig also filed a Voluntary Petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code in the United States Bankruptcy Court for the District of Colorado, Case No. 20-14530-JGR (the "*Craig Bk. Case*").

11.     In response to Question No. 18 on Dr. Craig's Statement of Financial Affairs, Dr. Craig listed the following transfers of cryptocurrency to Summerbrook Dental in November and December of 2019:

a. 20,000 units of XTroptions.gold – value $102,600 in November 2019

b. 150,000 units of XTroptions.gold – value $769,500 in November 2019

c. 78,107 units of XTroptions.gold – value $425,685 in December 2019

12.     On Schedule A/B: Property, Summerbrook Dental listed that it owned 130 units of Troptions.gold at $449.33 per unit; 129,534.80042143 units of Xtroptions.gold valued at $6.87/each on the Petition Date.

13.     On Schedule A/B: Property, Dr. Craig listed that he owned 130 units of Troptions.gold; 894,198 units of Xtroptions.gold; and 7,644,000,000 units of Egold.

14.     On September 3, 2020, in the Craig Bk. Case, Dr. Craig filed an Application to Employ Peter Kent as an Expert in Cryptocurrency for the Estate Pursuant to 11 U.S.C. §372 (the "*Kent Application to Employ*").  [Craig Bk. Case, Dkt. No. 60].  On September 8, 2020, the Court entered an Order granting the Kent Application to Employ.  [Craig Bk. Case, Dkt. No. 61].

15.     On September 3, 2020, in the Craig Bk. Case, Dr. Craig also filed a Motion to Approve Retainer to Peter Kent as an Expert in Cryptocurrency for the Estate pursuant to 11 U.S.C. §330 (the "*Retainer Motion*").  [Craig Bk. Case, Dkt. No. 58].  Paragraph 7 of the Retainer Motion provides that the retainer will be provided by [Dr. Craig] and will not impact [Dr. Craig's cash

3

flow. On September 29, 2020, the Bankruptcy Court entered an Order granting the Retainer Motion. In the Summerbrook Dental October 2020 monthly operating report, Summerbrook Dental lists an October 5, 2020 paypal echeck to Peter Kent Consulting in the amount of $5,000.00, which appears to be the $5,000 retainer to Mr. Kent.

16.     On November 19, 2020, in the Craig Bk. Case, Dr. Craig filed an Application for Compensation for Peter Kent, requesting fees in the amount of $9,806.50 (the "*Kent Fee Application*"). [Craig Bk. Case, Dkt. No. 96]. On December 14, 2020, the Bankruptcy Court entered an Order approving the Kent Fee Application. [Craig Bk. Case, Dkt. No. 119].

17.     On October 30, 2020, Dr. Craig filed the Report of Peter Kent. [Craig Bk. Case, Dkt No. 81]. In Mr. Kent's opinion the Troptions.gold, Xtroptions.gold and the Egold cryptocurrency (owned by Dr. Craig individually) had no value as of the date of the report.

18.     Relying on the Mr. Kent's expert opinion and follow-up discussions with Mr. Kent, the Sub V Trustee is informed and believes that the cryptocurrency owned by Summerbrook Dental currently has no value and had no value in October, November and December of 2019 when Dr. Craig transferred the cryptocurrency to Summerbrook Dental and Summerbrook Dental transferred the cryptocurrency to its creditors.

### III.     MERCHANT CASH ADVANCE LOANS

19.     After experiencing financial difficulties, Summerbrook Dental obtained a number of high interest, short-term loans with merchant cash advance ("*MCA*") lenders.

20.     Summerbrook Dental modified many of the standard lending agreements with the MCA lenders. The agreements were modified in way that was not immediately apparent without reading through the agreements. The modifications varied with each agreement but common modifications included: (a) allowing Summerbrook Dental to repay the loans with cryptocurrency; (b) granting very short-term security interests (3 to 7 days) in the described collateral; and (c) modify the description of the collateral securing the MCA loans.

21.     Some of the lending agreements were modified before the MCA loan proceeds were received and in two of the cases the loan documents were executed after receipt of the loan proceeds.

22.     From July of 2019 through December of 2019, Summerbrook obtained MCA loan proceeds (net of loan fees) in the amount of $664,256 relating to the following MCA loans (collectively, the "*MCA Loans*"):

a.     **FC Marketplace/Funding Circle**: On or about July 5, 2019, Summerbrook Dental obtained a loan from FC Marketplace/Funding Circle in the amount of $100,000 (the "*FC Marketplace Loan*"). As a result of the FC Marketplace Loan, on July 9, 2019, $93,010 was deposited into Summerbrook Dental's Chase Operating Account ending in #0530 (the "*Chase Operating Account*"). FC Marketplace filed a UCC-1 Financing Statement with the Colorado Secretary of State on July 9, 2019 Validation Number: 20192060477.

4

b. **LG Funding**: On or about September 26, 2019, Summerbrook Dental obtained a loan from LG Funding (*Rosewood Capital Group*) in the amount of $100,000 (the "*LG Funding Loan*").  As a result of the LG Funding Loan, on September 27, 2019, $97,950.00 was deposited into the Chase Operating Account.  Summerbrook Dental modified the loan documents for the LG Funding Loan to only grant a three (3) day security interest from the date of funding in the specific collateral described in the agreement.  LG Funding filed a UCC-1 Financing Statement on November 29, 2019, ID:20192110285.

c. **OnDeck**:  On October 8, 2019, Summerbrook Dental obtained a loan from OnDeck in the amount of $200,000 (the "*OnDeck Loan*").  As a result of the OnDeck Loan, $195,000 was deposited into the Chase Operating Account on October 8, 2019. The Business Loan and Security Agreement for the OnDeck Loan were dated October 16, 2019.  Summerbrook Dental modified the loan documents for the OnDeck Loan to only grant OnDeck a seven (7) day security interest in the specific collateral described in the agreement.  The Business Loan and Security Agreement were also modified to provide that Summerbrook Dental may repay the OnDeck Loan in cryptocurrency.  On October 5, 2019, CTHD Company filed a UCC-1 Financing Statement with the Colorado Secretary of State, ID #20192092434 asserting a security interest in all assets of the Summerbrook Dental.  It appears that this UCC-1 Financing Statement was filed to perfect the OnDeck loan.

d. **National Funding**.  Summerbrook Dental obtained a loan from National Funding in the amount of $66,000.00 (the "*National Funding Loan*").  As a result of the National Funding Loan, on October 9, 2019, $66,000 was deposited into the Chase Operating Account.  The loan documents for the National Funding Loan were dated October 7, 2019.

e. **Blue Vine/Celtic Bank Corporation.**  On or about October 16, 2019, Summerbrook Dental entered into a Financing and Security Agreement with Celtic Bank Corporation with Blue Vine as the servicer for a loan in the amount of $130,000 (the "*Blue Vine Loan*").  As a result of the Blue Vine Loan, on October 16, 2019, $127,905 was deposited into the Chase Operating Account.  Summerbrook Dental modified the loan documents for the Blue Vine Loan to only grant a security interest for 30 days in the specific collateral described in the modified loan agreement, after which time, there would be no security interest and to add a provision allowing Summerbrook Dental to repay the Blue Vine Loan in cryptocurrency.

f. **Headway Capital.**  Summerbrook Dental obtained a loan from Headway Capital in the amount of $50,000 (the "*Headway Capital Loan*"). As a result of the Headway Capital Loan, on October 18, 2019, $50,000 was deposited into the Chase Operating Account.  Summerbrook Dental modified the loan documents for the Headway Capital Loan to add a provision allowing Summerbrook Dental to repay the Headway Capital Loan in cryptocurrency.

5

g. **Kabbage/Celtic Bank.**   On or about December 30, 2019, Summerbrook Dental obtained a loan from Celtic Bank with Kabbage as the servicer in the amount of $34,400 (the "*Kabbage Loan*"). As a result of the Kabbage Loan, on December 31, 2019, $34,400 was deposited into Summerbrook Dental's Wells Fargo checking account ending in #3389 (the "*Wells Fargo Operating Account*"). Pursuant to the loan documents for the Kabbage Loan, Summerbrook Dental granted a blanket security interest in all of Summerbrook Dental's assets to secure the Kabbage Loan. It does not appear that Kabbage filed a UCC-1 Financing Statement with the Colorado Secretary of State to perfect its security interest.

## IV.   USE OF MCA LOANS PROCEEDS

23.   The loan proceeds from the MCA Loans were deposited into Summerbrook Dental's operating accounts and a portion used for operating expenses, including large payments to American Express. Dr. Craig has indicated that the charges on American Express were for operating expenses and the payments made to AmEx Fxip were for payroll.

24.   The MCA loans were repaid through electronic transfers from the Chase Operating Account.  From July 2019 through December 31, 2019, Summerbrook Dental paid approximately $115,000 to the MCA lenders listed above.

25.   From July 2019 to the Petition Date, Summerbrook Dental made the following transfers directly from the Chase Operating Account into Dr. Craig's personal account ending in 5104:

| Date | Type | Payee | Amount |
|---|---|---|---|
| 7/23/19 | Electronic Withdrawal | Personal Checking 5104 | $15,000.00 |
| 7/29/19 | Electronic Withdrawal | Personal Checking 5104 | $5,000.00 |
| 8/1/19 | Electronic Withdrawal | Personal Checking 5104 | $10,000.00 |
| 8/30/19 | Electronic Withdrawal | Personal Checking 5104 | 10,000.00 |
| 9/23/19 | Electronic Withdrawal | Personal Checking 5104 | $5,000.00 |
| 9/30/19 | Electronic Withdrawal | Personal Checking 5104 | $15,000.00 |
| 10/25/19 | Electronic Withdrawal | Personal Checking 5104 | $20,000.00 |
| 3/17/20 | Electronic Withdrawal | Personal Checking 5104 | $10,000.00 |

26.   From July 2019 to the Petition Date, Summerbrook made the following other withdrawals from the Chase Operating Account to unknown payees:

| Date | Type | Payee | Amount |
|---|---|---|---|
| 8/19/19 | Other Withdrawal | Unknown | $25,000.00 |
| 9/30/19 | Other Withdrawal | Unknown | $5,000.00 |
| 9/30/19 | Other Withdrawal | Unknown | $5,300.00 |
| 10/8/19 | Other Withdrawal | Unknown | $10,000.00 |
| 11/22/19 | Other Withdrawal | Unknown | $30,000.00 |
| 12/9/19 | Other Withdrawal | Unknown | $5,000.00 |

6

27.     In August of 2019, Summerbrook Dental opened up a money market account ending in 4791 (the "*Chase Money Market Account*"). Below are the transactions from the Chase Money Market Account through December 31, 2019. A $140,000 withdrawal was made from the Chase Money Market Account on December 9, 2019. The $140,000 withdrawal appears to be part of the $145,000 shareholder loan listed in response to Question 30.1 on Summerbrook Dental's Statement of Financial Affairs. Based on Dr. Craig's testimony, on February 18, 2020, $105,000 of the $140,000 was deposited into the Wells Fargo Operating Account. There was minimal activity in the Chase Money Market Account after December 31, 2019.

| Date | Type | Payee | Amount |
|---|---|---|---|
| 10/30/19 | Transfer From | Chase Operating Account | $310,000.00 |
| 11/5/19 | Withdrawal from MMA | Unknown | ($10,000.00) |
| 11/13/19 | Transfer To | Chase Operating Account | ($30,000.00) |
| 11/22/19 | Transfer To | Chase Operating Account | ($50,000.00) |
| 11/25/19 | Withdrawal from MMA | Unknown | ($5,000.00) |
| 11/26/19 | Transfer To | Chase Operating Account | ($30,000.00) |
| 12/2/19 | Transfer To: | Chase Operating Account | ($185,000.00) |
| 12/9/19 | Transfer From | Chase Operating Account | $140,000.00 |
| 12/9/19 | Other Withdrawal | Unknown | ($140,000.00) |
| | | Balance | $0.00 |

28.     In December of 2019, Summerbrook Dental opened the Wells Fargo Operating Account. Below lists transactions in the Wells Fargo Operating Account that had not been determined to relate to Summerbrook Dental's business operations. After discussions with counsel for Dr. Craig, Dr. Craig has provided the following explanations (identified in red) for some of these transactions. The Sub V Trustee has not received documentation to independently verify the explanations provided by Dr. Craig.

| Date | Type | Payee | Amount |
|---|---|---|---|
| 12/11/19 | Opening Deposit | | $8,000.00 |
| 12/18/19 | Withdrawal | Unknown<br>Christmas bonuses for staff. $400 per employee x 10 employees (Dr. Craig did not take this bonus) | ($4,000.00) |
| 1/15/20 | Wire Deposit | Unknown<br>Taxes for employee salaries – the payroll company was having a difficult time setting up the automatic wire transfers so for a few months Dr. Craig had to make the wire transfers manually at branch bank. | $7,893.34 |

7

| 1/15/20 | Wire Deposit | Unknown<br>Employee salaries | $25,007.48 |
| 1/15/20 | Electronic Withdrawal | ComputerTyme<br>Dental Microscope for root canal procedures. | ($20,000.00) |
| 1/15/20 | Withdrawal | Unknown<br>Dr. Craig's Distribution | ($10,000.00) |
| 1/16/20 | Check No. 7602 | Unknown<br>Patient refund for prepaid dental work. | ($4,700.00) |
| 1/17/20 | Check No. 7607 | Unknown<br>Payment to attorney who had been consulting with Dr. Craig on cryptocurrency issues, bankruptcy and how to pursue certain litigation claims. | ($5,000.00) |
| 1/21/20 | Check No. 7606 | Unknown<br>Rent Check. | ($5,417.83) |
| 1/23/20 | Withdrawal | Unknown<br>Dr. Craig's Distribution. | ($10,000.00) |
| 1/31/20 | Withdrawal | Unknown<br>Dr. Craig's Distribution. | ($11,000.00) |
| 2/10/20 | Withdrawal | Unknown<br>Payment to Click-Thru consulting, who manages website, web marketing. SEO, PPC, online reputation management and hosting. | ($15,000.00) |
| 2/18/20 | Deposit | BFB<br>Return of back pay due to and paid to BFB from $140,000 withdrawal from Chase Money Market Account. | $105,000.00 |
| 2/20/20 | Withdrawal | ComputerTyme.<br>The remaining payment due for the Dental Microscope. | $11,723.60 |
| 2/20/20 | Electronic Withdrawal | BOA – Nobel Biocare<br>Implant inventory and replacement of aging surgical kits | ($34,000.00) |

8

| 2/20/20 | Electronic Withdrawal | Trust Bank – Sleep Group<br>Purchase of sleep apnea<br>appliances. | ($16,500.00) |
|---------|----------------------|------------------------------------------------------------|--------------|
| 2/20/20 | Withdrawal | Complete Technology<br>Replacement of office<br>computers. | ($25,000.00) |
| 2/24/20 | Withdrawal | Unknown<br>Transfer to DIP account. | ($25,000.00) |
| 2/27/20 | Withdrawal | Unknown<br>Transfer to DIP account. | ($29,000.00) |

29.    From July of 2019 through December of 2019, Summerbrook Dental made monthly electronic transfers in the amount of $3,350.00 to Big Fat Bahonkus ("*BFB*"), a consulting business operated by Dr. Craig's wife, which provided administrative/office/billing services to Summerbrook Dental.  In addition, during that same time period, Summerbrook Dental made monthly electronic withdrawals to BFB in the amounts of:  $1,000 described as vehicle rental; $800 described as consulting fees; and $750.00 described as conference room rentals.  After the Petition Date, Summerbrook Dental listed the following payments to BFB on its monthly operating reports:

| | |
|---------|-----------|
| 3/2/20 | $7,224.51 |
| 3/26/20 | $5,000.00 |
| 3/26/20 | $1,000.00 |
| 3/31/20 | $1,300.00 |
| 4/1/20 | $3,650.00 |
| 4/15/20 | $3,650.00 |
| 5/1/20 | $3,650.00 |
| 5/14/20 | $3,650.00 |
| 5/27/20 | $2,500.00 |
| 6/1/20 | $3,650.00 |
| 6/15/20 | $3,650.00 |
| 6/15/20 | $2,500.00 |
| 6/30/20 | $2,500.00 |
| 7/1/20 | $3,650.00 |
| 7/15/20 | $2,500.00 |
| 7/15/20 | $3,650.00 |
| 7/30/20 | $2,500.00 |
| 8/17/20 | $3,650.00 |
| 8/17/20 | $2,500.00 |
| 8/31/20 | $2,500.00 |
| 9/1/20 | $3,650.00 |
| 9/15/20 | $3,650.00 |
| 9/15/20 | $2,500.00 |
| 9/30/20 | $2,500.00 |
| 10/1/20 | $3,650.00 |

9

| 10/5/20 | $3,650.00 |
| 10/30/20 | $2,500.00 |
| 11/2/20 | $3,650.00 |
| 11/16/20 | $3,650.00 |
| 11/30/20 | $2,500.00 |
| 12/1/20 | $3,650.00 |
| 12/15/20 | $3,650.00 |
| 12/15/20 | $2,500.00 |
| 12/30/20 | $2,500.00 |

30.     The projections including in Summerbrook Dental's Amended Plan of Reorganization dated September 18, 2020 for Small Business under Chapter 11, Subchapter V (the "*Amended Plan*"), budgets only $5,000.00 for consulting fees during the plan term.   On February 1, 2021, counsel for Summerbrook Dental advised that BFB returned $45,000 to Summerbrook Dental.  Dr. Craig has confirmed that the transfer of the $45,000 was completed on February 1, 2021.

31.     Starting in September of 2020, Summerbrook Dental made the following religious donations:

| 9/4/20 | $1,200.00 |
| 9/17/20 | $1,300.00 |
| 10/20/20 | $3,000.00 |
| 11/3/20 | $1,250.00 |
| 11/24/20 | $1,000.00 |
| 12/08/20 | $500.00 |
| 12/10/20 | $1,100.00 |
| 12/11/20 | $1,000.00 |
| 12/15/20 | $1,000.00 |
| TOTAL | $11,350.00 |

32.     The budget to the Amended Plan does not provide for religious donations.  Dr. Craig advised that he was not aware that the tithing payments were linked to the Summerbrook Dental business account instead of Dr. Craig's personal account.  Dr. Craig stated after he became aware that the payments were made from Summerbrook Dental's bank account, Dr. Craig transferred the full amount $11,350 from his personal account to the Summerbrook Dental debtor-in-possession account to correct this error.

33.     The budget to the Amended Plan shows $20,000.00 monthly distributions to Dr. Craig during the term of the Amended Plan.  Dr. Craig's December 2020 monthly operating report filed in the Craig Bk. Case shows distributions totaling $50,000 to Dr. Craig, with $10,000 transferred back, for total distributions to Dr. Craig in the amount of $40,000 for December 2020. Dr. Craig has advised that the amounts paid to him in December of 2020 was higher than normal but he was only paid $10,000 for the months of October and November of 2020.

Date:  February 3, 2021.            By:    */s/ Joli A. Lofstedt*
                                           Joli A. Lofstedt, Trustee
                                           PO Box 270561
                                           Louisville, CO  80027
                                           Ph:  (303) 476-6915
                                           Fx:  (303) 604-2964
                                           joli@jaltrustee.com

## CERTIFICATE OF SERVICE

I certify that on February 3, 2021, I served a complete copy of **REPORT OF INVESTIGATIONS** on the following parties in compliance with the Federal Rules of Bankruptcy Procedure and the Court's Local Rules:

**via CM/ECF:**
United States Trustee
Robert Samuel Boughner, Esq.
Jeffrey S. Brinen, Esq.
Kelsey Jamie Buechler, Esq.
William Cross, Esq.
Kutner Brinen, P.C.
Robert Padjen, Esq.
Keri L. Riley, Esq.
Deanna L. Westfall
John F. Young

Summerbrook Dental Group, PLLC          FC Marketplace, LLC
6795 South Robertsdale Way              c/o Becket & Lee LLP
Aurora, CO 80016                        PO Box 3002
                                        Malvern, PA 19355-0702

                                        */s/ Brenda J. Comstock*
                                        Brenda J. Comstock, Legal Assistant

11